PUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ARCHIE LEE BILLINGS,
          *Petitioner-Appellant,*

v.

MARVIN POLK, Warden of Central
Prison, Raleigh, North Carolina,
          *Respondent-Appellee.*

No. 05-8

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
Frank W. Bullock, Jr., District Judge.
(CA-03-286-1-FWB)

Argued: February 3, 2006

Decided: March 14, 2006

Before WILKINSON, LUTTIG, and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge Luttig wrote the opinion, in
which Judge Wilkinson and Judge Michael joined.

## COUNSEL

**ARGUED:** Kevin Patrick Bradley, Durham, North Carolina, for
Appellant. Steven Franklin Bryant, Assistant Attorney General,
NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North
Carolina, for Appellee. **ON BRIEF:** Cynthia Katkish, Washington,
D.C., for Appellant. Roy Cooper, Attorney General of North Caro-
lina, Raleigh, North Carolina, for Appellee.

**OPINION**

LUTTIG, Circuit Judge:

Petitioner-appellant Archie Lee Billings appeals the district court's denial of his petition for a writ of habeas corpus. Finding no error in the district court's adjudication of Billings' claims, we affirm.

I.

On September 12, 1995, Archie Lee Billings was indicted in North Carolina for first-degree murder, first-degree rape, first-degree kidnapping, first-degree burglary, and assault with a deadly weapon with intent to kill, inflicting serious injury. J.A. 8-12. In May 1996, a jury convicted Billings on all counts, *id.* at 80-84, and, after a separate capital sentencing proceeding, recommended a death sentence, *id.* at 266-72, which the state court duly imposed, *id.* at 273-74. The facts underlying Billings' convictions and death sentence, as summarized by the Supreme Court of North Carolina on direct appeal, are as follows:

> The State's evidence tended to show *inter alia* that Robert Jackson left his Caswell County mobile home at 1:50 a.m. on 7 July 1995 to gather and ready a herd of cows for milking. Jackson left his two children, Bobby, thirteen years old, and Amy, eleven years old, asleep in their beds. Sometime between 1:50 a.m. and 4:50 a.m., [Billings] entered the mobile home, stabbed Bobby repeatedly with a knife, and began his assault on Amy. Bobby struggled to a telephone in the kitchen and dialed 911. When emergency personnel arrived at 5:00 a.m., Bobby was found on the kitchen floor in a pool of his own blood. [Billings] had stabbed the boy some twenty-three times. Bobby identified [Billings] as the man who stabbed him and whom he had seen carry his sister out of the mobile home. It was not until some twelve hours later that Amy's body was found in a field, with her pajama bottoms around her feet and her pajama top partially torn off. Amy had died from a stab to her throat that had severed her carotid artery. An autopsy revealed that Amy had also been sexually assaulted. [Billings] worked with Jackson on

the dairy farm, and both children knew him well. [Billings] was arrested by sheriff's deputies on the dairy farm the same morning the children were attacked.

*Id*. at 292.

On May 8, 1998, the Supreme Court of North Carolina affirmed Billings' convictions and sentence, *id*. at 285-308, and on November 16, 1998, the United States Supreme Court denied Billings' petition for a writ of certiorari, *Billings* v. *North Carolina*, 525 U.S. 1005 (1998). On November 10, 1999, Billings filed a Motion for Appropriate Relief ("MAR") with the Superior Court of Caswell County, North Carolina. J.A. 309-14. That motion was denied, *id*. at 324-61, and the North Carolina Supreme Court denied Billings' petition for a writ of certiorari, *id*. at 362.

On March 5, 2003, Billings filed a petition for a writ of habeas corpus in the Eastern District of North Carolina. *Id*. at 363-72. The case was subsequently transferred to the Middle District of North Carolina, *id*. at 373-74, which denied the petition and dismissed the action with prejudice, *id*. at 430. On November 7, 2005, we granted Billings' motion for a certificate of appealability. This appeal followed.

## II.

In reviewing the district court's denial of Billings' habeas petition, we review the district court's conclusions of law *de novo* and its findings of fact for clear error. *Quesinberry* v. *Taylor*, 162 F.3d 273, 276 (4th Cir. 1998). Because this case comes before us on collateral review, our authority to grant relief is limited by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as well as by the Supreme Court's decision in *Teague* v. *Lane*, 489 U.S. 288 (1989). Under AEDPA, we may not grant habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim — (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

§ 2254(d). Under *Teague*, Billings may not have the benefit of any new constitutional rule of criminal procedure announced after his conviction became final.[1] 489 U.S. at 310. With these standards of review in mind, we turn to the merits of Billings' claims.

### III.

On appeal, Billings raises five issues, three relating to allegations of juror misconduct, one relating to improper arguments made by the prosecutor during sentencing proceedings, and one relating to the trial court's submission of a mitigating circumstance to the jury over Billings' objection. We consider each of Billings' claims in turn.

### A.

Billings' first claim relates to juror Janie Coleman's alleged failure to answer honestly material questions on *voir dire*. During *voir dire*, defense counsel asked a panel of potential jurors, including Coleman, whether anyone "[knew] of any reason at all why [he or she] could not be a fair and impartial juror in this trial." J.A. 57. Coleman did not raise her hand in response to this question. *See id.* When asked a similar question by the court, Coleman expressly stated that she knew of no reason why she could not give both the state and the defendant a fair and impartial trial. *Id.* at 63. During a separate exchange, defense counsel Jim Tolin, who had previously represented Coleman's daughter-in-law in a domestic matter, asked Coleman whether his representation of her daughter-in-law would "cause [her] any problems." *Id.* at 75. Coleman responded that it would not, and, in response to Tolin's question, "What are your feelings about me?", stated that she had "no hard feelings" about him. *Id.* She further affirmed that she did not believe in punishing the defendant for anything Tolin might have done. *Id.* at 75-76. After further examining Coleman, Tolin informed the court that the defense was "content with this juror," and Coleman was accepted as juror number ten. *Id.* at 78-79.

---

[1]*Teague*'s restriction is subject to two narrow exceptions not applicable in this case. *See Teague*, 489 U.S. at 311.

In an affidavit submitted after trial, Coleman revealed several facts that she had not disclosed on *voir dire*. She stated that she "knew [the prosecutor] previously but not well" and that she was grateful that he had previously dropped an assault charge against her. *Id*. at 315. She also stated that defense counsel Tolin had heard an unemployment case of hers twenty years ago, that he had ruled against her, and that, before the trial, she would not have hired him. *Id*. Based on these statements from Coleman's affidavit, Billings argued before the state MAR court that his right to a fair jury trial was violated "because in voir dire, juror Janie Coleman failed to disclose that she was biased in favor of the prosecution by her gratitude toward the prosecutor for previously dropping an assault charge against her and by her animosity against one of appointed counsel for previously ruling in favor of her former employer and against her in her unemployment case." *Id*. at 310. The state MAR court rejected Billings' claim, concluding that the facts alleged in Coleman's affidavit, even if proven true, were insufficient to entitle Billings to relief. *Id*. at 326. The district court concluded that this ruling was neither contrary to nor an unreasonable application of clearly established federal law. *Id*. at 396.

The district court did not err. In order to obtain a new trial based on a juror's failure to disclose information during *voir dire*, Billings "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *See McDonough Power Equipment, Inc.* v. *Greenwood*, 464 U.S. 548, 556 (1984). Billings has not satisfied the first prong of this test. Coleman's affidavit does not, contrary to Billings' contention, establish that she failed to answer honestly a material question on *voir dire*. Rather, it shows at most that Coleman failed to volunteer certain information when questioned about her ability to be impartial. Coleman's failure to volunteer this information does not amount to a dishonest response to the questions posed.[2] The fact that Coleman was

---

[2]Nor does it amount to a deliberate omission of material information. In *Williams* v. *Taylor*, the Court concluded that a hearing was necessary because a juror had deliberately omitted material information when responding to questions posed by defense counsel on *voir dire*. 529 U.S. 420, 440-44 (2000). In that case, the juror indicated that she was not related to any of the witnesses even though she had been married to one

grateful to the prosecutor for dismissing charges against her does not establish that Coleman was being dishonest when she stated that she could be a fair and impartial juror. And neither the fact that Coleman believed defense counsel Tolin had ruled against her in an unemployment matter nor the fact that she would not have hired him before the trial establishes that Coleman was being dishonest when she stated that she had no hard feelings against Tolin and that his previous representation of her daughter-in-law would not affect her ability to give the defendant a fair trial. In short, other than the question about Tolin's representation of her daughter-in-law, Coleman was never asked about any previous contacts she may have had with the attorneys involved in the case, and nothing in her post-trial affidavit suggests that she was anything less than forthright and honest in the answers she gave to the questions she was asked. It may be that Billings' trial attorneys should have more thoroughly explored the prospective jurors' past contacts with the attorneys involved in the case. But *McDonough* provides for relief only where a juror gives a dishonest response to a question actually posed, not where a juror innocently fails to disclose information that might have been elicited by questions counsel did not ask. *See McDonough*, 464 U.S. at 555 (noting that "[a] trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the

---

of them for 17 years and was the mother of his four children. *Id.* at 440. She also stated that she had never been represented by any of the attorneys even though one of them had represented her during her divorce. *Id.* at 440-41. The juror later explained that she did not consider herself "related to" her former husband and that, because her divorce was uncontested, she did not think the attorney had "represented" her. *Id.* at 441. As to the first question, the Court concluded that, even if the juror's answer was technically or literally correct, it suggested an unwillingness to be forthcoming. *Id.* As to the second question, the Court concluded that the juror's failure to disclose material information was "misleading as a matter of fact because, under any interpretation, [the attorney] had acted as counsel to her and [her ex-husband] in their divorce." *Id.* at 441-42. In this case, by contrast, none of Coleman's answers was misleading, disingenuously technical, or otherwise indicative of an unwillingness to be forthcoming. There is simply nothing in the record that would allow us to conclude that Coleman deliberately omitted material information during *voir dire*.

slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination"). Accordingly, the state court's conclusion that Billings failed to adduce facts sufficient to entitle him to relief on his juror misrepresentation claim was neither contrary to nor an unreasonable application of clearly established federal law.

Billings also contends in his brief on appeal that the state MAR court violated clearly established federal law by resolving his claim without holding an evidentiary hearing to explore whether Coleman was actually biased in favor of the prosecution because of her past contacts with the prosecutor and defense counsel. *See Jones* v. *Cooper*, 311 F.3d 306, 310 (4th Cir. 2002) ("The *McDonough* test is not the exclusive test for determining whether a new trial is warranted: a showing that a juror was actually biased, regardless of whether the juror was truthful or deceitful, can also entitle a defendant to a new trial."). It is unclear based on the materials before the court whether Billings even requested an evidentiary hearing with respect to actual bias before the state MAR court.[3] But even if he did, the state court was not required to hold a hearing in these circumstances because Billings had ample opportunity at *voir dire* to discover Coleman's past contacts with the attorneys. Nothing in federal law requires a state court to hold a post-trial evidentiary hearing about matters that the defendant could have explored on *voir dire* but, whether by reason of neglect or strategy, did not. It is true that the Supreme Court "has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Smith* v. *Phillips*, 455 U.S. 209, 215 (1982). But this does not mean that a court is obliged to hold an evidentiary hearing any time that a defendant alleges juror bias, regardless of whether he utilized the pre-trial procedures available for ensuring the jury's impartiality.[4] Otherwise,

---

[3]Billings' motion to the state MAR court did not contain a request for a hearing on actual bias. J.A. 310. In denying relief, however, the MAR court concluded that there was insufficient evidence to hold an evidentiary hearing with respect to any of the five juror misconduct claims Billings raised before that court. *Id.* at 325-26.

[4]In cases where the Supreme Court has required a hearing, the source of potential bias was not discoverable on *voir dire*, either because a juror

defendants would be able to sandbag the courts by accepting jurors onto the panel without exploring on *voir dire* their possible sources of bias and then, if their gambit failed and they were convicted, challenging their convictions by means of post-trial evidentiary hearings based on newly discovered evidence of possible juror bias. We conclude that, even assuming Billings asked the state court to hold an evidentiary hearing on actual bias, its refusal to do so was neither contrary to nor an unreasonable application of clearly established federal law.[5]

---

deliberately omitted material information in response to questions asked on *voir dire* or because the circumstances that potentially compromised the juror's impartiality did not arise until after the trial had begun. *See, e.g.*, *Williams*, 529 U.S. at 440-42 (2000) (stating that a hearing was needed where a juror deliberately omitted material information when responding to questions posed on *voir dire*); *Phillips*, 455 U.S. at 216-18 (concluding that a hearing was an adequate remedy where, during trial, a juror applied for a job at the prosecutor's office); *Remmer* v. *United States*, 347 U.S. 227, 230 (1954) (ordering a hearing where, during trial, a juror was offered a bribe and was subsequently investigated by an FBI agent). That fact also distinguishes the principal Fourth Circuit case on which Billings relies. *See Fullwood* v. *Lee*, 290 F.3d 663, 680-82 (4th Cir. 2002) (requiring a hearing where a juror's husband pressured her throughout the trial to vote for the death penalty).

[5]For the same reason that federal law does not obligate a state court to hold a post-trial evidentiary hearing about matters that were fairly discoverable on *voir dire*, a federal habeas court is not required to hold an evidentiary hearing about such matters on collateral review. Indeed, under AEDPA, a federal habeas court is likely forbidden from holding an evidentiary hearing where the petitioner failed, as Billings did here, to investigate the facts at the appropriate stage of the state court proceedings. *See* 28 U.S.C. § 2254(e)(2) (stating that, subject to two narrow exceptions not applicable here, a federal habeas court may not hold an evidentiary hearing with respect to a claim "if the applicant has failed to develop the factual basis of [the] claim in State court proceedings"); *cf. Williams*, 529 U.S. at 442 (concluding that petitioner's failure to discover facts that a juror had deliberately omitted on *voir dire* was not a "failure" to develop the factual basis of the claim under § 2254(e)(2) where the trial record contained no evidence that would have put a reasonable attorney on notice that the juror had deliberately omitted material information); *Townsend* v. *Sain*, 372 U.S. 293, 317 (1963) (stating that "[i]f, *for*

### B.

Billings next claims that he was denied his rights to a fair trial and an impartial jury because an alternate juror wore a T-shirt one day during trial that said "No Mercy — No Limits," and members of the jury saw and joked about the T-shirt. *See* J.A. 315, 317. The state MAR court concluded that these facts, even if proven true, were insufficient to entitle Billings to relief, *id.* at 326, and the district court concluded that this ruling was neither contrary to nor an unreasonable application of clearly established federal law, *id.* at 417-18.

The district court did not err. Billings cites no decision or line of decisions by the Supreme Court that clearly establishes that a jury's exposure to a T-shirt like the one at issue here amounts to a violation of the defendant's constitutional rights. Instead, Billings cites a Ninth Circuit decision holding that a rape defendant's right to a fair trial was violated when the trial judge permitted spectators at his trial to wear buttons bearing the words "Women Against Rape." *See Norris* v. *Risley*, 918 F.2d 828 (9th Cir. 1990). However, that decision is relevant to this habeas action only insofar as it would have been objectively unreasonable *under Supreme Court precedent* to reach a contrary conclusion, *see Williams* v. *Taylor*, 529 U.S. 362, 409-10, 412 (2000); 28 U.S.C. § 2254(d)(1), and it most assuredly would not have been objectively unreasonable under Supreme Court precedent to reach a contrary conclusion in *Norris*. *Norris* relied principally upon *Estelle* v. *Williams*, 425 U.S. 501 (1976), which concluded that the state cannot compel an accused to stand trial before a jury while dressed in identifiable prison clothes; *Cox* v. *Louisiana*, 379 U.S. 559, 562 (1965), where the Court, in the course of overturning the defendant's conviction for picketing near a courthouse, noted that "[t]he constitu-

---

*any reason not attributable to the inexcusable neglect of petitioner*, evidence crucial to the adequate consideration of the constitutional claim was not developed at the state hearing, a federal hearing is compelled" and that "[t]he standard of inexcusable default . . . adequately protects the legitimate state interest in orderly criminal procedure, for it does not sanction needless piecemeal presentation of constitutional claims in the form of deliberate by-passing of state procedures") (emphasis added and internal citation omitted).

tional safeguards relating to the integrity of the criminal process . . . exclude influence or domination by either a hostile or friendly mob;" and *Turner* v. *Louisiana*, 379 U.S. 466 (1965), which held that the defendant's right to a fair trial by an impartial jury was violated when the prosecution's principal witnesses were allowed to have extensive private contact with the jury.

These precedents do not clearly establish that a defendant's right to a fair jury trial is violated whenever an article of clothing worn at trial arguably conveys a message about the matter before the jury. It would not be objectively unreasonable to conclude that the jury's exposure to a T-shirt or button that could, but need not necessarily, be construed as conveying a message about the matter before the jury simply does not rise to the level of a constitutional violation in the way that it does when the court forces the defendant to appear before the jury in prison garb, allows the trial to be influenced or dominated by a mob, or allows the prosecution's key witnesses to have extensive interaction with the jury. *See Phillips*, 455 U.S. at 217 (noting that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation" and that "it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote"). We thus cannot say that the state court's rejection of Billings' claim was contrary to or an unreasonable application of clearly established federal law, as determined by the Supreme Court.[6]

---

[6]Billings also asserts that he is entitled under *Remmer* to an evidentiary hearing to explore the potential prejudicial effect the T-shirt may have had upon the jury. In *Remmer*, the Supreme Court ordered a hearing where a juror who had been offered a bribe was investigated by an FBI agent during trial. 347 U.S. at 230. The Court held that a presumption of prejudice requiring a hearing arises when there is "any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury." *Id.* at 229. Even making the dubious assumption that the message on the T-shirt here constituted a "private communication, contact, or tampering" with the jury within the meaning of *Remmer*, Billings is not entitled to a hearing. To obtain a hearing, Billings must first establish that the unauthorized contact "was of such a character as to reasonably draw into question the integrity of the verdict." *Stockton* v. *Virginia*, 852 F.2d 740, 743 (4th Cir. 1988). We

## C.

Billings raises one other claim relating to alleged juror misconduct. Juror Steve Irby stated in a post-trial affidavit that, on the night before the jury's sentencing deliberations, he read the Bible at home because he was "very confused and didn't know what to do," and that his study of the Bible helped him conclude that the death penalty was the "right sentence." J.A. 319. The state MAR court concluded that these facts, even if proven true, were insufficient to entitle Billings to relief, *id*. at 326, and the district court concluded that this ruling was neither contrary to nor an unreasonable application of clearly established federal law, *id*. at 419-21.

The district court did not err. Billings argues that the juror's consultation of the Bible raises a presumption of prejudice under *Remmer* v. *United States*, in which the Supreme Court held that a presumption of prejudice arises when there is "any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury." 347 U.S. at 229. However, it is not at all clear that a juror's consultation of the Bible even constitutes a "private communication, contact, or tampering" with the jury under *Remmer*, which used those terms in the context of a case where a juror was offered a bribe and was subsequently investigated by an FBI agent during the trial. As the district court noted, "[t]he United States Supreme Court has not addressed whether consulting a Bible prior to jury deliberations constitutes improper extraneous information that gives rise to a presumption of prejudice." J.A. 420. It would not be objectively unreasonable to conclude that *Remmer*'s presumption of prejudice arises only where a juror has a private contact with another individual about the matter pending before the jury, and not

---

simply do not believe that the message conveyed by the T-shirt (it is not even clear precisely what message, if any, the words "No Mercy — No Limits" conveyed) is of such a character as to reasonably draw into question the integrity of the jury's decision to convict and recommend a death sentence. *Cf. id*. at 745-46 (finding that the integrity of the verdict was reasonably drawn into question where a restaurant proprietor approached a group of jurors during lunch, inquired about their deliberations, and told them he thought they "ought to fry the son of a bitch").

whenever a juror reads a book that influences his thinking about the case. It would thus not be objectively unreasonable to conclude that a juror's consultation of the Bible in the privacy of his home does not constitute an improper communication under *Remmer*. Indeed, this court has previously concluded that a juror's recitation of passages from the Bible during deliberations did not constitute an improper communication under *Remmer*. *See Burch* v. *Corcoran*, 273 F.3d 577, 591 (4th Cir. 2001) ("We agree with the district court that, under the circumstances, what occurred here did not constitute an improper jury communication.").[7] We thus conclude that the state court's rejection of Billings' claim was neither contrary to nor an unreasonable application of clearly established federal law, as determined by the Supreme Court.

D.

Billings next claims that his due process rights were violated when the prosecutor referred to the Bible during the sentencing proceedings. During closing arguments, the prosecutor made the following remarks:

> So, ladies and gentlemen of the jury, I remind you that what was once written: "And if he smite him with an instrument of iron [objection by defense counsel overruled] so that he died, he is a murderer; the murderer shall surely be put to death. And if he smite him with throwing a stone where he

---

[7]The district court characterized the private consultation of the Bible in this case as "less onerous" than the recitation of passages from the Bible during deliberations in *Burch* because here the consultation of the Bible affected only one juror. J.A. 421. Billings argues that private consultation of the Bible is worse than quoting the Bible during deliberations because, in the latter case, the jurors can remind each other that they have a duty to rest their decision on the law and not on the Bible. But whether the Bible consultation in this case was somehow less or more onerous than that in *Burch* is ultimately beside the point. What matters for purposes of this habeas action is that, in either case, it would not be objectively unreasonable to conclude that the consultation of the Bible did not constitute an extraneous contact that raises a presumption of prejudice under *Remmer*.

may die, and he died, he is a murderer; the murder[er] should surely be put to death. Or if he smite him with a hand weapon of wood where he may die and he died, he is a murderer; the murderer shall be put to death. If he thrust him of hatred or hurl at him by laying of wait that he die, or in enmity smite him with a hand that he die, he that smote him, shall surely be put to death, for he is a murderer." For these things shall be a statute of judgment.

And I argue to you, ladies and gentlemen, that Chapter 15A of the North Carolina General Statute, Section 2000, the formula of the law that guides you through your issues and recommendations in your verdict sheet that is the law across the state of North Carolina, is the statute of judgment in this case.

Now, as I argued to you from the Old Testament, the defense may argue the compassion taught in the New Testament. May I remind you that it's written in Luke Chapter 20:25: "And he said unto them render therefore under [sic] Caesar the things which be Caesar's and unto God the things which be God's.

J.A. 170-71.

On direct appeal, Billings raised a due process claim based on the prosecutor's reference to the North Carolina death penalty statute as a "statute of judgment" in conjunction with his quotations from the Bible. The North Carolina Supreme Court rejected his claim, concluding that it was procedurally defaulted because Billings did not raise an objection at trial.[8] *Id.* at 303. The North Carolina Supreme Court further concluded that "the prosecutor merely contended to the jury

---

[8]Billings objected when the prosecutor first began quoting from the Bible, but he was overruled. He did not lodge a further objection to the prosecutor's reference to the North Carolina death penalty statute as a statute of judgment, and it was apparently this lack of a specific objection that caused the North Carolina Supreme Court to conclude that Billings had forfeited his claim by not making a contemporaneous objection. *See* J.A. 303.

that the Bible did not prohibit the death penalty, but he did not ask the jury to impose divine law," and that "[t]he prosecutor's argument was not so grossly improper as to require the trial court to intervene" in the absence of an objection. *Id.* The district court concluded that Billings' claim was procedurally defaulted, that Billings had not established cause and prejudice or a miscarriage of justice to excuse the default, and, in any event, that the prosecutor's arguments did not amount to a violation of due process. *Id.* at 414-15.

On appeal, the parties dispute whether the North Carolina Supreme Court's ruling that Billings procedurally defaulted his due process claim constitutes an independent and adequate state bar precluding federal habeas review. Billings argues that the ruling was not "independent" of his federal claim because, in concluding that the prosecutor's arguments were not so grossly improper as to require the court to intervene *sua sponte* under state law, the North Carolina Supreme Court applied the federal rule of constitutional law that governs claims of prosecutorial misconduct.[9] *See Ake* v. *Oklahoma*, 470 U.S. 68, 75 (1985) ("[W]hen resolution of the state procedural law question depends on a federal constitutional ruling, the state-law prong of the court's holding is not independent of federal law, and our jurisdiction is not precluded.").

We decline to resolve whether this case is governed by *Ake* because we agree with the district court that, even if Billings' claim is not procedurally barred, it fails on the merits. Improper prosecutorial arguments violate due process only where they render the proceedings fundamentally unfair. *Bennett* v. *Angelone*, 92 F.3d 1336, 1345 (4th Cir. 1996). "In making this determination, we must look at the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the judge's charge, and whether the errors were isolated or repeated." *Id.* at 1345-

---

[9]Under North Carolina law, a court may not grant relief based on improper prosecutorial arguments unless the defendant raised a contemporaneous objection or the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *State* v. *Daniels*, 446 S.E.2d 298, 318-19 (N.C. 1994) (quoting the federal standard for reviewing claims of improper prosecutorial argument applied in *Darden* v. *Wainwright*, 477 U.S. 168, 181 (1986)).

46 (internal quotation marks and citation omitted). In *Bennett*, this court addressed Bible-based death penalty arguments similar to those made by the prosecutor here.[10] The court concluded that, while the prosecutor's comments were inappropriate because they "improperly drew on his reading of biblical law to justify the morality of the state's death penalty," the defendant's due process rights were not violated. *Id.* at 1346. The court reasoned that the prosecutor's comments, "viewed in the total context of the trial," were not "sufficiently egregious to render [the defendant's] trial fundamentally unfair" because the evidence as to defendant's guilt was powerful, the murder was undoubtedly vile, and the judge instructed the jury that the lawyers' comments were not to be considered as evidence. *Id.* at 1346-47.

All of the *Bennett* factors are present here. The evidence against Billings was abundant,[11] the rape and murder of the girl were undoubtedly vile, and the judge instructed the jury that the lawyers' arguments at sentencing were "not to be considered as your instructions on the law." J.A. 143. Moreover, Billings' lawyer also made Biblical arguments to the jury during the sentencing proceedings. *Id.* at 211 (reminding the jury that the Apostle Paul was "a murderer, a persecutor of Christians" before "he was forgiven and he changed his ways"). Given the totality of the circumstances, we conclude, as we did in *Bennett*, that while the prosecutor may have improperly invoked the Bible to justify the morality of the state's death penalty statute, his argument did not render the proceedings so fundamentally unfair as to deprive Billings of due process.

Billings also argues that the prosecutor violated his Eighth Amendment rights by referring to the North Carolina death penalty statute as a "statute of judgment" and by stating that the duty to give all citizens equal protection of the law was a "prescription" that "call[ed] for

---

[10]The prosecutor in *Bennett* argued that, after the flood, God gave the "sword of justice" to Noah and that "Noah is now the Government." 92 F.3d at 1346. He argued that "thou shalt not kill" is a proscription against individuals, not governments. *Id.* And he quoted the "render unto Caesar" passage, stating that the "moral [is] follow the law and leave the rest to Heaven." *Id.*

[11]Billings was identified by the boy, who knew him well. And, in any event, Billings did not deny that he committed the murder.

imposition of the death penalty." *See id.* at 171-72. Billings relies on *Caldwell* v. *Mississippi*, 472 U.S. 320 (1985), in which the Supreme Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328-29. It is unclear whether Billings raised a *Caldwell* claim before the North Carolina courts, but again, it does not matter because even if the claim is not procedurally barred, it fails on the merits. In *Caldwell*, the prosecutor repeatedly emphasized that the jury's decision would not be final because it was subject to automatic review by the state supreme court. *Id.* at 325-26. The Court overturned the death sentence, emphasizing that "the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death." *Id.* at 341. Here, the prosecutor's reference to the North Carolina statute as a "statute of judgment" simply cannot fairly be characterized as an attempt to minimize the jury's sense of responsibility or to mislead the jury into believing that the ultimate decision as to the death penalty rested elsewhere. So too with the prosecutor's statement that the duty to prescribe equal protection to all citizens called for imposition of the death penalty. In context, the prosecutor's comment was part of his exhortation that the jurors set aside any personal opposition to the death penalty and faithfully apply the death penalty statute, which required them to weigh the aggravating and mitigating circumstances. *See* J.A. at 171-72 ("[Y]ou should raise your hand now if you can't follow the law and if you plan to substitute your personal convictions against the law . . . because it is a duty to prescribe equal protection of the law to all citizens, and the prescription here calls for imposition of the death penalty. The aggravating circumstances outweigh any mitigating circumstances and they are so substantial, they are compelling. They thrust you in that direction."). We do not believe the prosecutor's comments were intended to, or did in fact, minimize the jury's sense of responsibility for the sentencing decision or lead them to believe that the ultimate decision as to Billings' sentence rested elsewhere. Accordingly, the prosecutor's comments did not violate the Eighth Amendment under *Caldwell*.

E.

Billings' final claim is that the state trial court violated his Sixth Amendment right to conduct his own defense when it submitted a mitigating circumstance to the jury over his objection. At the instruction conference preceding the sentencing proceedings, the prosecutor requested submission to the jury of the statutory mitigating circumstance of lack of a significant history of prior criminal activity. J.A. 135. Defense counsel objected, but the court, concluding that it was required by North Carolina law to submit the mitigating circumstance to the jury, overruled the objection and included the circumstance along with the other mitigators listed on the form submitted to the jury.[12] *Id*. at 135-37. Billings contends that the submission of this mitigating circumstance was prejudicial because the jurors would have considered his prior criminal record to be significant and would therefore have considered the evidence for the mitigating circumstance to be frivolous, and, having concluded that the evidence for this circumstance (which was first on the list submitted to the jury) was frivolous, would have tended to consider the evidence for the other mitigating circumstances frivolous as well.[13]

---

[12]Under North Carolina law, if the evidence supporting a mitigating circumstance is such that a rational jury could find the circumstance, the trial court has no discretion and must submit the circumstance to the jury, regardless of the wishes of the state or the defendant. *State* v. *Lloyd*, 364 S.E.2d 316, 323-24 (N.C. 1988), *sentence vacated on other grounds*, 488 U.S. 807 (1988). The evidence here showed that Billings had previously been convicted of two felonies (breaking and entering and larceny) and five misdemeanors (simple affray, resisting an officer, driving with a revoked license, and two counts of secret peeping). *See* J.A. 124, 131-32, 305. The state court determined that it was required to submit the mitigating circumstance because a rational jury could conclude that Billings' convictions did not amount to a significant history of prior criminal activity. *See id*. at 138-40.

[13]Billings argues that this prejudicial effect was exacerbated by the fact that the trial court allowed the prosecutor to tell the jury that the mitigating factors had been requested by the defendant. *See* J.A. 154. According to Billings, this furthered the prosecutor's ability to construct a "straw man" out of the mitigator for no significant history of criminal activity. However, any prejudicial effect that might have arisen from the prosecutor's statement was countered by the fact that Billings' attorney informed the jury that the mitigating factor of no significant history of criminal activity had not been requested by the defense. *See id*. at 187. Also, the

Billings raised his Sixth Amendment claim before the North Carolina Supreme Court, which denied Billings a new sentencing hearing, but limited its analysis to the state-law question whether a rational jury could have found that Billings had no significant history of prior criminal activity. *See id.* at 305. The court did not consider — or at least there is no indication that it considered — whether submitting the mitigating circumstance to the jury over Billings' objection violated his Sixth Amendment right to conduct his own defense. Because the state court did not adjudicate Billings' Sixth Amendment claim on the merits, we review the claim without the deference otherwise mandated by AEDPA. *See* 28 U.S.C. § 2254(d) (requiring deference to a state court's legal and factual determinations "with respect to any claim that was adjudicated on the merits in State court proceedings"). However, the rule of *Teague* — that federal habeas courts may not announce or apply new rules of constitutional criminal procedure — remains in force. *See Horn* v. *Banks*, 536 U.S. 266, 272 (2002) (*per curiam*) (noting that AEDPA does not relieve federal habeas courts from addressing *Teague*). Indeed, the district court found *Teague* to be dispositive, concluding that a rule of law holding unconstitutional North Carolina's mandatory mitigating circumstances regime "would constitute a new rule of federal law that cannot be announced on habeas review." J.A. 410.

We agree with the district court. In order to overcome the bar to relief imposed by *Teague*, Billings must show that precedent existing at the time his conviction became final dictated that the submission of a mitigating circumstance to the jury over the defendant's objection violates the defendant's Sixth Amendment right to control the presentation of his defense. *See Teague*, 489 U.S. at 301. In other words, Billings must show that, at the time his conviction became final, all reasonable jurists would have agreed, based on existing precedent, that North Carolina's mandatory mitigating circumstances regime was

---

premise of Billings' straw man argument — that the jurors would certainly consider Billings' prior criminal record to be significant — is undermined by the fact that one or more jurors found that Billings had no significant history of criminal activity and weighed that fact in his favor. *See id.* at 268, 302.

unconstitutional as applied to an objecting defendant. *See Butler* v. *McKellar*, 494 U.S. 407, 415 (1990).

Billings cannot make the required showing. He relies upon the Supreme Court's statement in *Strickland* v. *Washington* that the "[g]overnment violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense."[14] 466 U.S. 668, 686 (1984). For this proposition, which is obviously too open-ended to dictate the result of any particular case, the *Strickland* Court cited *Geders* v. *United States*, 425 U.S. 80 (1976), which held that the defendant's right to assistance of counsel was violated when the trial court ordered him not to consult his attorney during an overnight recess; *Herring* v. *New York*, 422 U.S. 853 (1975), which held that the defendant's right to assistance of counsel was violated where the trial court refused to allow defense counsel to make a summation of the evidence; *Brooks* v. *Tennessee*, 406 U.S. 605 (1972), which held that the defendant's rights against self-incrimination and to due process were violated by the state's requirement that the defendant testify first if he testified at all; and *Ferguson* v. *Georgia*, 365 U.S. 570 (1961), which held that, where the defendant was allowed to make an unsworn statement at trial, due process required that defense counsel be allowed to aid the defendant by eliciting his statement through questions.

None of these cases is sufficiently analogous to the present circumstances to dictate the conclusion that Billings' right to control the presentation of his defense was violated by the trial court's submission

---

[14]Billings also relies upon *United States* v. *Davis*, 285 F.3d 378 (5th Cir. 2002). Even assuming that circuit precedent, as opposed to Supreme Court precedent, is relevant in determining whether a rule is dictated by precedent under *Teague*, *Davis* is unavailing because it does not dictate the result Billings seeks. *Davis* held that the defendant's right to self-representation under *Faretta* v. *California*, 422 U.S. 806 (1975), was violated when the trial court appointed independent counsel and ordered him to present mitigating evidence, despite the fact that the defendant wished to represent himself and argue his innocence rather than present mitigating evidence. This case, by contrast, does not involve any infringement of Billings' *Faretta* right to proceed *pro se*.

of a mitigating circumstance to the jury over his objection. None of the cases has anything to do with the submission of mitigating circumstances to the jury during capital sentencing proceedings. And, in cases where the Court has dealt specifically with that issue, it has emphasized the importance of ensuring that the jury has access to all mitigating evidence. *See, e.g.*, *Buchanan* v. *Angelone*, 522 U.S. 269, 276 (1998) (stating that "the sentencer may not be precluded from considering . . . any constitutionally relevant mitigating evidence" and that "the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence"). To be sure, *Angelone* did not necessarily contemplate the situation in which the defendant, rather than the state, seeks to block the submission of mitigating evidence. But that does not change the fact that it remains an open question whether the state's important — indeed, constitutionally mandated — interest in structuring its sentencing proceedings so as to reserve the death penalty for those most deserving of it must give way to any interest the defendant may have in keeping a mitigating circumstance from the jury. To hold North Carolina's mandatory mitigating circumstance rule unconstitutional would therefore be to announce a new rule of constitutional criminal procedure on habeas review in violation of *Teague*. Accordingly, we agree with the district court that we cannot grant Billings relief on this claim.

## CONCLUSION

For the reasons stated, the judgment of the district court denying Billings' petition for a writ of habeas corpus is affirmed.

*AFFIRMED*