ROWE, J.,
dissenting.
I respectfully dissent. . Long asserts that the trial court erred in denying his motion for new trial because of actual or inherent prejudice arising from the presence of a group of private spectators, “Bikers Against Child Abuse,” at trial. Because the record demonstrates that the spectator conduct at issue in this case did not inherently or actually prejudice Long’s right to a fair trial, I would affirm the order of the trial court denying the motion for new trial.

Procedural History

On the morning of trial, four of the jurors observed multiple individuals sitting within several feet of them, outside the courtroom in the hallway. The individuals, who were mostly men, were wearing leather vests which read “Bikers against Child Abuse.” Defense counsel immediately brought the matter to the attention of the trial court and moved for a mistrial. In response, the trial court questioned the prosecutor, who admitted that she knew some of the bikers, but she asserted that she advised them not to wear their vests or paraphernalia in the courtroom. The trial court then interviewed individually each of the jurors who observed the spectators in the hallway. Each of the jurors admitted that they observed the bikers, but they stated that no one spoke with them. All but one of the jurors admitted to reading the patches on the bikers’ vests. Each juror answered affirmatively when asked if they could still be impartial at trial, despite observing the spectators in the hallway. Finding one of the juror’s responses to be equivocal, the trial court dismissed the juror. One of the remaining three jurors, when he was asked whether the spectators would cause him to favor the State against the defendant in any way, responded: “No, I would be disappointed if they were in the parking lot when we were going home.” The trial court then asked, “Why is that, sir?” The juror responded, “I am being honest. I don’t think that will happen. I don’t think it will have any bearing on the case, what *506 soever, you know, other than what the facts are presented in here.” The trial court offered to have a bailiff escort the juror to and from the courthouse so he would not have further contact with the group. The juror assured the court that he was not intimated by the group.
After excusing the one juror whose response was equivocal, the trial judge stated that he had no reservations about the other three jurors. While the jurors were outside of the courtroom, the trial judge addressed the bikers and informed them that their actions had delayed the proceedings. The judge explained that he had to question the jurors to make sure that no one had been influenced by the group and that he had to strike a juror because of the group’s behavior. The trial judge then instructed the bikers not to wear their “insignia” in the courtroom and not to congregate around the jury. He explained that he could not take the chance of a juror running into a member of the group during recesses. The trial judge' then denied the motion for mistrial.
The trial proceeded with several of the bikers present as spectators in the courtroom. Following the jury’s return of a guilty verdict as charged on all of the pending charges, the defense moved for a new trial. Counsel argued that Long’s right to a fair trial was prejudiced by the presence of the bikers, whom defense counsel described as “burly men.” Counsel asserted that twelve or thirteen bikers sat in the courtroom in close proximity to the jury during the trial. The trial court held a hearing on the motion, and substantial argument was presented. The trial court denied the motion, carefully outlining its reasoning and disputing several of the factual assertions defense counsel made regarding the presence of the bikers in the courtroom:
I made the decision at the time. I looked at the jurors when they came in here. I judged their demeanor. . I felt like the three that answered my questions were sincere, and they said, “It’s not going to bother us.” The one guy did make the offhand comment, “Well, I don’t want them to be there in the parking lot afterwards,” but that didn’t — it was not — it did not undermine my confidence in his ability to be fair and impartial, particularly, in the way he addressed my questions.
Understanding, I’ve thought a lot about this, since the trial, because it’s not a simple issue. For the record, though, I do want to make it very clear, that there was a reference in the new trial motion that somehow there were like 12 or 13 individuals from this group sitting in the, you know, in the pews — in the seats closest to the jury, is the way it’s been referenced in there.
I’m not sure you can say all those individuals that were in that group of people, were with the Bikers Against Abuse. Some of them were family members that were non-testifying family members, they appeared to me anyway. And I don’t — some were with the biker group. No question about it.
They were properly attired. No one had on leather or chains or anything of that nature or whatever. But it’s not — I don’t want the record to somehow go up, and that be accepted as the fact. Because there were plenty of people out there that looked to me like they’re just simply family members.
And so I don’t know exactly how many were there. There were some that stayed through. They were sitting in the pews that are set aside for people that are, you know, sitting in the audience. And I didn’t feel like — it’s an open proceeding. And I didn’t feel like *507 at this point I could ban anybody from coming in the courtroom. And so that made my decision.
[[Image here]]
I have confidence that the people who remained on the trial, were not effected [sic] by it, in the way of their impartiality in the case. One of them, in fact, was kind of offended that they were out there in a way, the tone. I forget the gentleman’s name. But he was basically like, “I don’t really care that they’re out there.” And so I feel like it’s — that the motion should be denied on that basis, all right.
Based on the foregoing facts, the trial court denied the motion for new trial. This appeal follows.

Analysis

The issue before this Court is whether Long received a constitutionally fair trial where several individuals appeared briefly outside the courtroom, in the presence of four jurors, wearing vests adorned with the words “Bikers Against Child Abuse” and then a number of those individuals attended the trial not wearing the vests. I would affirm the trial court, holding that it did not abuse its discretion and that Long received a constitutionally fair trial.
The right to a fair trial by an impartial jury is the cornerstone of our criminal justice system. It is well-settled that certain “courtroom practices are so mimical to the presumption of innocence that they violate defendants’ due process rights.” U.S. v. Olvera, 30 F.3d 1195, 1196 (9th Cir.1994). Practices such as requiring the defendant to appear at trial while shackled or wearing prison garb have been universally condemned by state and federal courts as inherently prejudicial based on the unacceptable risk of impermissible factors coming into play. Carey v. Musladin, 549 U.S. 70, 75, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006); Deck v. Missouri, 544 U.S. 622, 635, 125 S.Ct. 2007, 161 L.Ed.2d 953 (2005); Moon v. Head, 285 F.3d 1301, 1317 (11th Cir.2002); Olvera, 30 F.3d at 1196; U.S. v. Harris, 703 F.2d 508, 510 (11th Cir.1983); Knight v. State, 76 So.3d 879, 886 (Fla.2011). Courts have also determined that the defendant’s right to a fair trial is inherently prejudiced by the presence of a large number of uniformed law enforcement officers attending the trial as spectators. Woods v. Dugger, 923 F.2d 1454 (11th Cir.1991); Shootes v. State, 20 So.3d 434 (Fla. 1st DCA 2009). Central to the courts’ condemnation of each of these practices — the shackling of defendants, compelling defendants to wear prison garb, or the presence of uniformed officers as spectators — is the conclusion that government-sponsored conduct in the courtroom runs an unacceptably high risk of influencing the jury in favor of the prosecution.
This case requires us to decide whether the presence of a group of private individuals,[2] members of the group “Bikers Against Child Abuse,” who wore vests outside the courtroom in the presence of four jurors before trial, coupled with the presence of unidentified members of the biker’s group (not wearing vests or other insignia) inside the courtroom deprived Long of his fundamental right to a fair trial. Long urges this Court to apply the inherent prejudice test to resolve this issue, even though this situation involved *508 conduct by private spectators.[3]
The question of whether conduct by a private spectator at trial can be found inherently prejudicial is a matter of first impression for this Court and has been expressly left unanswered by the United States Supreme Court. Carey, 549 U.S. at 76, 127 S.Ct. 649. In Carey, the Supreme Court addressed the limits of the inherent prejudice test. In a case involving a petition for habeas corpus, a California state court had decided that the petitioner’s right to a fair trial was not denied where members of the murder victim’s family wore buttons displaying the victim’s image during the petitioner’s trial. Id. at 72, 127 S.Ct. 649. The petitioner sought habeas relief, which led the Ninth Circuit to issue an opinion finding that the state court’s decision was contrary to a clearly established rule of federal law. Id. at 73, 127 S.Ct. 649. In its opinion, the Supreme Court distinguished its previous decisions in Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), and Holbrook v. Flynn, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), observing that those cases involved government-sponsored conduct by spectators, as opposed to the situation in Carey, which involved buttons worn by private spectators. Id. at 75, 127 S.Ct. 649. The Supreme Court noted that while it had prescribed the test for inherent prejudice applicable to state conduct, “we have never applied that test to spectators’ conduct. Indeed, part of the legal test of Williams and Flynn asking whether the practices furthered an essential state interest-suggests that those cases apply only to state-sponsored practices.” Id. at 76, 127 S.Ct. 649 (emphasis in original). The Supreme Court concluded that none of its holdings required the California state court to apply the Williams and Flynn tests to conduct by private spectators, and it vacated the grant of the writ of habeas. Id. at 77,127 S.Ct. 649.
Since Carey was decided, only a handful of federal and state courts have addressed whether conduct by private spectators inside the courtroom, such as the displaying of buttons, badges, or photographs, may inherently prejudice a defendant’s right to a fair trial. The Fourth Circuit Court of Appeals addressed a situation where an alternate juror wore a shirt that said “No Mercy — No Limits.” Billings v. Polk, 441 F.3d 238, 247 (4th Cir.2006). There, the court found no violation and cautioned that a defendant’s right to a fair trial is not violated “whenever an article of clothing worn at trial arguably conveys a message about the matter before the jury.” Id.
The Supreme Court of Washington held that the defendant was not deprived of a fair trial where private spectators wore buttons depicting the murder victim at trial. State v. Lord, 161 Wash.2d 276, 165 P.3d 1251, 1254 (2006) (en banc). In so holding, the court observed that spectators’ signs of affiliation “do not automatically present ‘an unacceptable risk ... of impermissible factors coming into play.’” Id. at 1254 (citing Holbrook v. Flynn, 475 U.S. 560, 570, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986)). The Supreme Court of Indiana held that nothing in the record supported a finding that trial counsel was ineffective for failing to object or move the trial court for an order directing spectators not to wear buttons with pictures of the victim. Overstreet v. State, 877 N.E.2d 144, 157-59 (Ind.2007). The Supreme *509 Court of Kentucky has held that the defendant’s right to a fair trial was not violated when members of the victim’s family wore shirts containing the words, “In loving memory,” and displaying the victim’s image. Allen v. Commw., 286 S.W.3d 221, 227-29 (Ky.2009).
At issue in this case is whether the wearing of insignia by spectators outside the courtroom in the presence of four jurors, followed by the mere presence of a group of those spectators, not wearing any sign of group affiliation, at trial may deprive a defendant of a fair trial. The Sixth Amendment of the United States Constitution and Article I, section 16(a) of the Florida Constitution guarantee the defendant the right to a fair trial by an impartial jury. At the same time, an important tenet of our criminal justice system is that the criminal trial and courtroom shall be open to the public, including the victims of crime, their next of kin, and their lawful representatives. Art. I, § 16, Fla. Const; Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 611, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982) (O’Connor, J., concurring) (discussing our “long history of open criminal trials and the special value, for both the public and accused, of that openness”); People v. Cummings, 4 Cal.4th 1233, 18 Cal.Rptr.2d 796, 850 P.2d 1, 43 (1993) (“The right to public trial is not that of the defendant alone.”). With these principles in mind, trial courts must strike a balance between the defendant’s right to a fair and impartial jury and the right to a public trial.[4] A due process violation will not be found “every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable.” Smith v. Phillips, 455 U.S. 209, 217, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Instead, “[cjourts must presume that jurors we entrust with determining guilt both understand, and have the fortitude to withstand, the potential influence from spectators who show sympathy or affiliation.” Lord, 165 P.3d at 1253.
The Florida Supreme Court has never held or implied that a defendant has been deprived of the right to a fair trial by private spectators displaying buttons, pictures, or other insignia inside the courtroom. And, it has certainly never attempted to regulate the conduct of spectators outside the courtroom, in regards to the wearing of buttons, pictures, or other insignia. The supreme court addressed the issue of private-spectator conduct inside the courtroom in Bell v. State, 965 So.2d 48, 69 (Fla.2007). Bell claimed that his trial counsel was ineffective for failing to obtain a definitive ruling on a motion to strike the jury panel because a spectator wore a shirt memorializing and depicting one of the murder victims during jury selection. Id. The supreme court noted that the trial court inquired into whether the jury had seen the shirt and found that none of the jurors realized who was depicted on the shirt and that none of the jurors would have let the shirt influence their decision. Id. at 70-71. The supreme court held that there was no reason for the court to strike the panel and that Bell failed to show that any prejudice occurred. Id. at 71.
The supreme court considered another claim involving private-spectator conduct inside the courtroom in Buckner v. State, *510 714 So.2d 384 (Fla.1998). In Buckner, the defendant asserted that spectators holding up photographs during the guilt phase of his trial created undue sympathy that warranted a mistrial. Id. at 389. The trial court determined that two of the jurors saw the photographs. Id. One juror stated that she thought the family’s actions were inappropriate and that it would not influence her decision. Id. The second juror stated that she refused to look at the pictures and that the incident would not influence her decision. Id. The trial court denied Buckner’s motion for mistrial. Id. The supreme court acknowledged that such displays may deprive a defendant of a fair trial, but it held that “a judge may objectively look to the extrinsic factual matters disclosed to the jury and then determine whether there was a reasonable possibility that the breach was prejudicial to the defendant.” Id. As in Bell, the supreme court concluded that there was no reasonable possibility that the jury’s brief exposure to the photographs influenced the outcome of the proceeding. Id.
Based on the record, the conduct by private spectators in this case did not deprive Long of his right to a fair trial. After the trial court ruled on Long’s motion for mistrial, Long did not object in any way during the trial to the presence of the bikers in the courtroom. Not until all of the evidence had been presented and the jury had rendered its verdict did Long voice his objection to the presence of the bikers through his motion for a new trial. For this reason, there is no record as to precisely how many bikers were present in the courtroom or precisely where the bikers sat in the courtroom. See Overstreet, 877 N.E.2d at 159 (holding that the defendant failed to show that counsel rendered deficient performance by failing to object to spectators wearing buttons with the victim’s picture because there was no record as to the size of the buttons, if the jurors could see the buttons, how many people were wearing the buttons, how many days of the trial the buttons were worn, or whether any juror was affected by the buttons).
The record is undisputed that the bikers did not engage in any conduct inside the courtroom to disrupt the trial. The record reflects that none of the bikers wore vests or other identifying insignia inside the courtroom. The trial court took precautionary measures and questioned the veni-re regarding the effect, if any, of their brief observation of the bikers in their vests outside the courtroom. The three jurors who remained on the jury after questioning all denied that their observations of the bikers would affect them. Finally, the court instructed the jurors not to permit sympathy or prejudice to affect their verdict. Simply put, there is absolutely no evidence in the record that the jurors in this matter were in any way influenced by the presence of the bikers before and during the trial. Indeed, the trial court, who was in the best position to monitor the atmosphere of the courtroom, found no actual or inherent prejudice as a result of the presence of the bikers in the hallway before trial or as a result of the presence of the unidentified bikers in the courtroom during the trial. The trial court’s examination of the circumstances must be given considerable weight. On this record, I would conclude that the trial court did not abuse its discretion in denying the motion for mistrial and the motion for new trial. There is no reasonable probability that the bikers’ conduct, wearing vests outside the courtroom and attending the trial as unidentified spectators, created an unacceptable risk of impermissible factors coming into play during the trial. Accordingly, I dissent, and I would affirm Long’s judgments and sentences.

. Neither Long nor the majority cites to anything in the record to indicate that the conduct complained about here was state-sponsored. Although the prosecutor had spoken to a group of bikers before the day of trial, she also advised the bikers NOT to wear their insignia in the courtroom. It is also not clear whether the bikers the prosecutor spoke to were the same bikers who were present at trial.

. Long and the majority rely heavily on Norris v. Risley, 918 F.2d 828 (9th Cir.1990), to support their argument. However, Noiris was decided sixteen years before the Supreme Court’s decision in Carey. Based on the Supreme Court’s language in Carey regarding the question of whether private-spectator conduct may result in inherent prejudice, their reliance on Noms is misplaced.

. In striking this balance, the trial court has several remedies available to minimize the risk of prejudice raised by spectator conduct including, offering a remedial instruction to the jury, requiring spectators to remove buttons or insignia, or excluding spectators. See State v. Atwood, 171 Ariz. 576, 832 P.2d 593, 633 (1992), overruled on other grounds by State v. Nordstrom, 200 Ariz. 229, 25 P.3d 717 (2001).