# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs March 26, 2014

## STATE OF TENNESSEE v. LETALVIS DARNELL COBBINS

**Appeal from the Criminal Court for Knox County**
**No. 86216A      Walter C. Kurtz, Senior Judge**

---

**No. E2013-00476-CCA-R3-CD - Filed September 12, 2014**

---

For his involvement in the January 2007 murders of the victims C.N. and C.C.,[1] appellant, Letalvis Darnell Cobbins, was found guilty of multiple counts of first degree murder, facilitation of first degree murder, especially aggravated robbery, especially aggravated kidnapping, facilitation of especially aggravated kidnapping, and aggravated rape, for which he received an effective sentence of life in prison without the possibility of parole plus one hundred years. He appeals his convictions and sentences on the following grounds: (1) whether misconduct of the trial judge constituted structural constitutional error; (2) whether the trial court erred in denying appellant's motion for change of venue; (3) whether the trial court erred in admitting certain photographs; (4) whether the trial court erred in denying appellant's motion to continue; (5) whether the trial court erred in allowing testimony concerning a firearm that appellant had possessed prior to the offense date; (6) whether the trial court erred in allowing family members to wear buttons with the victims' likenesses; and (7) whether the trial court erred in imposing an effective sentence of one hundred years to be served consecutively to his sentence of life in prison without the possibility of parole. We have thoroughly reviewed the record in this case and discern no error. Accordingly, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, J., and JEFFREY S. BIVINS, SP. J., joined.

Kimberly Ann Parton (at trial and on appeal) and G. Scott Green (at trial), Knoxville, Tennessee, for the appellant, Letalvis Darnell Cobbins

---

[1] Although this is a murder case, the victims also suffered sexual assaults. It is the policy of this court to protect the identity of victims of sexual offenses by referring to them and their immediate family members by their initials.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Randall E. Nichols, District Attorney General; and Leland L. Price and Ta Kisha Fitzgerald, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This appeal stems from the Knoxville murders of victims C.N. and C.C. and other criminal offenses against them committed by appellant, co-defendant Lemaricus Davidson, co-defendant George Thomas, and co-defendant Vanessa Coleman in January 2007.

### A. Facts from Trial

Appellant's trial began on Wednesday, August 12, 2009, with jury selection in Davidson County. The parties presented evidence in Knox County from Monday, August 17 through Saturday, August 22, 2009.[2] Based on the collective testimony of M.N., the mother of victim C.N.; Josh Anderson, a friend of C.N.; Kara Sowards, a friend of C.C.; and G.C., C.C.'s father, the State established that in January 2007, C.N. had been dating C.C. for approximately three months. On January 6, 2007, C.N. played golf with Josh Anderson for most of the day. C.N. and C.C. had plans to go out to dinner and later attend a party being held at the home of Jamie Hampton's parents, where they would meet Mr. Anderson and other friends. M.N. did not expect C.N. to return home until Sunday, January 7, 2007.

C.C. was waiting at Kara Sowards's Washington Ridge apartment around 5:30 p.m. on Saturday, January 6, 2007, when Ms. Sowards arrived home. As they were getting ready to leave for Jamie Hampton's party, C.N. telephoned C.C. and proposed that they have dinner together and meet Ms. Sowards at the party later. Ms. Sowards drove to the party alone, and C.C. remained at her apartment to wait for C.N.

Around 9:30 p.m., Mr. Anderson became concerned that C.N. and C.C. had not yet arrived at the party. He placed several telephone calls to C.N. Saturday night that went unanswered. Ms. Sowards began calling C.C. around 10:00 p.m. to find out when they expected to arrive. Later, Mr. Anderson and Justin Russell drove to the apartment of Kara Sowards to see if C.N. was there. Mr. Anderson noticed that C.N.'s truck was in the parking lot but that C.C.'s vehicle, a Toyota 4-Runner, was not. He observed that it was out of the ordinary because C.N. always drove when he and C.C. went out together. He and Mr. Russell returned to the party between 11:00 and 11:30 p.m. Other party attendees attempted to reach C.N. via telephone, but he did not answer their calls, either.

---

[2] Because appellant does not challenge the sufficiency of the evidence, we have provided a summary of the evidence presented at trial.

C.C. called G.C. around 12:30 a.m. on Sunday, January 7, 2007, and told him that she and C.N. had eaten dinner and were finishing a movie and that she would be home within a couple of hours. He clarified that C.C. "sounded as normal as she could possibly be" and that she could not have sounded so calm if she had been under duress.

Ms. Sowards arrived home around 3:30 a.m. on Sunday. C.N.'s truck was parked in the parking lot. Ms. Sowards awakened between 10:30 and 11:00 a.m. on Sunday and again telephoned C.C., to no avail. During this time, Mr. Anderson continued to call C.N. and still received no answer. Mr. Anderson telephoned C.N.'s parents.

On Sunday afternoon, D.C., C.C.'s mother, telephoned M.N. because C.C. did not report to work as scheduled and had not been seen since the following night. M.N. telephoned the police and hospitals while her husband and friends of the victims searched for them. As the day progressed, D.C. received information from their cellular provider regarding the location of the tower from where C.C.'s last telephone call had "pinged," which was Cherry Street located in East Knoxville.

Mr. Anderson, Mr. Russell, G.C., and C.C.'s brother met at Ms. Sowards's apartment and embarked on a search of the Cherry Street area. After searching for approximately one and a half hours, a member of the party located C.C.'s vehicle between 1:30 and 2:00 a.m. on Monday morning. It was parked in high grass on Chipman Street in East Knoxville. The decals had been removed. The inside of the front cabin was very muddy, and there was a crushed pack of cigarettes that did not belong to either victim. A cellular charger had been destroyed, and the seats were reclined to their maximum angle. C.C. had been carrying a large amount of clothing to donate to Goodwill, and she had not yet dropped off the donation. The value of C.C.'s 4-Runner was between $25,000 and $26,000. Neither C.N. nor C.C. were located at that time.

At trial, D.C. identified several items of evidence, including specific items of clothing that were to be donated to charity and some of C.C.'s personal possessions that she carried in her vehicle and/or in her purse.

Xavier Jenkins, an employee with Waste Connections on Chipman Street, reported to work around 12:30 a.m. on Sunday, January 7, 2007. He noticed that a nearby house, 2316 Chipman Street, "seemed a little busy." He saw a late model silver Toyota 4-Runner in front of the house and an older model white car. As he was waiting for his supervisor to arrive and unlock the gates to the business, Mr. Jenkins observed the Toyota, occupied by four black males, drive past him and turn right. When Mr. Jenkins completed his shift between 7:00 and 7:30 a.m., he noticed the Toyota parked in the area in which Mr. Jenkins himself had been

parked as he waited for his supervisor. At that time, the vehicle still had decals and a license plate trim on it.

James Bradley Pressley, also an employee of Waste Connections, arrived at work between 1:30 and 2:00 a.m. on Sunday morning and almost collided with a silver SUV in the parking lot as he drove toward the gate to open it. The vehicle drove away as he exited his vehicle to open the gates, but the occupants, two in the front and at least one in the back, "look[ed] real hard at [him]." When Mr. Pressley completed his shift between 5:30 and 6:00 a.m., he again saw the same SUV sitting in the parking lot. He looked briefly in its direction, then began to walk away. At that time, he heard two or three loud popping sounds that seemed to have originated in the vicinity of the nearby railroad tracks. Mr. Pressley thought little about the sounds and proceeded to lock the gate and leave. He then saw smoke coming from the area of the tracks but ignored it.

Roy L. Thurman, who worked nearby at R&T Coatings on Boone Street, arrived at work at 7:45 a.m. on Sunday, January 7, 2007. While waiting for his supervisor to open the gate, Mr. Thurman observed smoke emanating from the area of the railroad tracks.

Jerome Arnold, a resident of Chipman Street, heard sounds that resembled "three fire crackers going off" around 1:45 a.m. on Sunday morning. He believed the sounds had come from a vacant industrial area where railroad tracks ran.

J.D. Ford, a locomotive engineer with Norfolk Southern Railway Corporation, left the John Sevier Yard off of Rutledge Pike in a train at 12:05 p.m. on January 7, 2007. After crossing over Cherry Street, he discovered along the track the naked body of a deceased male whose head had been severely burned. Fred Duffey, an assistant track supervisor with Norfolk Southern, had inspected the area at 9:00 a.m. that day and had not seen the body at that time.

Dan Crenshaw, a senior evidence technician with the Knoxville Police Department's ("KPD") forensic unit crime lab, was working the third shift, 11:00 p.m. to 7:00 a.m., on January 7-8, 2007. He received a call about the discovery of C.C.'s Toyota around 1:00-2:00 a.m. on Monday, January 8. The officer on the scene briefed him with regard to a body found nearby that was related to the recovered vehicle and the owner of the vehicle who was still missing. Mr. Crenshaw photographed and inventoried the vehicle and processed the hard surfaces for latent fingerprints. He lifted several latent prints, but none could be identified. Based on his findings, Mr. Crenshaw opined that the vehicle had been wiped clean. He had the vehicle towed and stored at the police impound lot.

Later in the day, Mr. Crenshaw recalled that he had seen a bank envelope in the back seat of C.C.'s vehicle as he was photographing and inventorying the contents. As he drove to work that night, he stopped at the impound yard and retrieved the envelope. He successfully lifted a latent print that was matched to the right thumb of co-defendant Lemaricus Davidson (hereinafter referred to as "co-defendant Davidson"). While he waited for a second examiner to confirm the match at the start of the 7:00 a.m. shift, Mr. Crenshaw ascertained co-defendant Davidson's last known address, which was 2316 Chipman Street. Mr. Crenshaw also learned that co-defendant Davidson had outstanding warrants against him.

Mr. Crenshaw drove past 2316 Chipman Street when he left work around 7:00 a.m. on Tuesday, January 9, 2007. He noticed very little activity. Based upon the information he provided, officers made entry into the residence that afternoon. During the search, officers recovered C.C.'s body in a garbage can in the kitchen. Officers reported no signs of life. They called for the criminal investigative division to process the scene, and the SWAT team left the area.

Joe Cox, a crime scene investigator with the KPD forensics unit, and his team recovered the following items from the scene: two trash bags from the laundry/utility room; one trash bag found alongside the garbage can in the kitchen; a comforter, a gray purse, and a burned driver's license from one of the bags in the utility room; cartridge cases and a gas can from the glassed-in porch; a prescription bottle for Stacy Lawson from the south bedroom; a gun case from the north bedroom; two .22 caliber bullets from the floor of the north bedroom; a box of .22 caliber ammunition from a shelf in the north bedroom; a .22 caliber casing on top of the refrigerator in the kitchen; a gas can beside the refrigerator; "All Purpose Cleaner with bleach" beside the sink in the kitchen; three pieces of a floral bedsheet from two different trash bags; a gas can beside the steps in the back yard; a .9 mm magazine from a shelf in the north bedroom; a .30 caliber magazine on top of silverware in a drawer in the kitchen; C.C.'s iPod from a basket in the north bedroom; and the garbage can in which C.C. was found.

Mr. Crenshaw processed several items for fingerprints that were seized during the initial entry. He lifted prints belonging to appellant from two photographs that were found in the north bedroom of the house, where it was later determined that C.C. was kept. He found co-defendant Davidson's prints on the box of garbage bags and five of his palm prints on the bags, but he did not find any other prints belonging to appellant. However, he opined that the lack of fingerprint evidence was not determinative because garbage bags are, by nature, poor surfaces from which to lift prints due to the wrinkles in the plastic.

-5-

Investigator Todd Childress of the KPD responded to the crime scene where C.N.'s body was discovered on January 7, 2007. When he arrived, the victim's face was wrapped in a sweatshirt-like material that had been burned. He was unable to make an identification at that time, but later in the evening, C.N.'s family filed a missing persons report. Another officer who was familiar with C.N. positively identified his body the following morning. After the medical examiner removed the sweatshirt material, Investigator Childress saw a blindfold over C.N.'s eyes and a gag stuffed into his mouth. They notified C.N.'s family then began the search for C.C. On Tuesday morning, Investigator Childress received information from Dan Crenshaw about a fingerprint he had identified. Based on that information, Investigator Childress began gathering background information on co-defendant Davidson while simultaneously preparing a search warrant for co-defendant Davidson's residence. Officers executed the search warrant on Tuesday and began the search for co-defendant Davidson and appellant thereafter. They were unable to locate either suspect on Wednesday, but on Thursday, Investigator Childress was advised that three people had been taken into custody in Kentucky and that co-defendant Davidson had been arrested in Knoxville.

Investigator Childress recalled that when co-defendant Davidson was arrested, officers impounded a white Pontiac Sunbird from the nearby Ridgebrook apartment complex that was thought to be involved in the case. The Sunbird was identified as the white car that was parked outside of 2316 Chipman Street when the 4-Runner was parked there.

Linda Littlejohn, a TBI special agent/forensic scientist in the microanalysis section of the laboratory, testified as an expert witness in her field. She analyzed fourteen pieces of floral fabric taken from the victims' autopsies, two pieces of floral fabric removed from the Chipman Street residence, and several pieces of a pink fabric curtain. Agent Littlejohn's physical comparison of the floral fabric pieces taken from C.N.'s autopsy to the remaining pieces revealed them to be consistent in color and pattern, but she could not "fracture match," i.e. piece them together to form a larger piece, the pieces. However, pieces of fabric recovered during C.C.'s autopsy matched along the fracture line with fabric found at the residence, which indicated that the pieces had been joined at one time.

Patricia Resig, a firearms examiner with the KPD, testified as an expert witness in her field. She examined a silver Clerke revolver that had been in appellant's possession and determined that it did not fire the bullets that were recovered during C.N.'s autopsy. She examined a second High Standard revolver and concluded that the six cartridge cases found at the residence were fired by that revolver, but she could not state with certainty whether the bullets found at the residence had been fired by that particular revolver. Moreover, two of the three bullets recovered from C.N.'s body during the autopsy were fired by a third weapon that had not been submitted to her for examination. The third bullet might have been fired

by the same weapon as the two, but the bullet sustained too much damage for comparison. The unfired .22 caliber long cartridges found at the residence could have been fired by either revolver.

Stacy Lawson lived in Lebanon, Kentucky, in December 2006 and January 2007. She met appellant through her friend, co-defendant Vanessa Coleman, who was dating appellant at the time. During the aforementioned period, Ms. Lawson traveled to Knoxville with appellant and others three times, where they stayed at the residence of appellant's half-brother, co-defendant Davidson. On her second trip, which occurred around December 16, she saw appellant cleaning a silver handgun in the bathroom of the residence. Appellant explained to her that co-defendant Davidson had shown him two weapons and had allowed appellant to choose which one he wanted to keep. The third trip began on December 28, and Ms. Lawson traveled with her boyfriend, co-defendant George Thomas; appellant; and co-defendant Coleman. She did not recall seeing the handgun during the third trip, which spanned from December 28 through January 2, 2007. Ms. Lawson returned home early from that trip, alone, because co-defendant Davidson had pointed a gun at her and frightened her.

When the remainder of the party returned to Kentucky, Ms. Lawson visited with them at the home of Natosha Hays on January 10. They appeared as if something were wrong. Appellant told her that co-defendant Davidson had done "something crazy" and "had killed two people." Appellant believed that law enforcement would visit Ms. Lawson's home because she had left a prescription bottle at co-defendant Davidson's residence, and it bore her name and address. Thus, appellant asked Ms. Lawson to report that they had all returned with her on January 2, but she refused. While at Ms. Hays's home, Ms. Lawson observed everyone reading a news report about the murders on the computer. She asked appellant if he had been involved, and he left the room without answering.

Ethel Lynn Freeman was acquainted with co-defendant Davidson because he was her drug dealer. In December 2006, he, appellant, co-defendant Thomas, co-defendant Coleman, and Stacy Lawson helped her move from her home to an apartment at Washington Ridge. During the move, she gave co-defendant Davidson several unneeded items, and he agreed to purchase other items. On January 6, 2007, she expected him to bring a payment for the items to her apartment, but he did not show up. Ms. Freeman went to sleep and awoke at 3:51 a.m., when she called co-defendant Davidson. He answered but sounded breathless. She drove to his residence on Sunday morning, January 7. When she arrived around 11:30 a.m., she saw co-defendant Thomas walking toward the railroad tracks wearing a "hoodie." The following day, Monday, Ms. Freeman drove to co-defendant Davidson's house. She said it resembled a "ghost town," and it was "vacated." She did not stop because she saw a police car down the street, so she left the area. Ms. Freeman confirmed that she had given co-defendant Davidson floral bedding and curtains.

Daphne Sutton, co-defendant Davidson's girlfriend at the time, moved to the Chipman Street address with him in November 2006, together with her two children. Soon thereafter, Ms. Sutton and co-defendant Davidson began having problems; specifically, co-defendant Davidson "put[] his hands on" her. On Friday, January 5, they argued again, and co-defendant Davidson again physically assaulted her. She left the house, walked to a nearby gas station, and called her friend Kassie Suttles to pick her up. She stayed at the apartment Ms. Suttles shared with Brandy Pressley that weekend. On Sunday, January 7, Ms. Sutton heard on the news that a body had been found, and she called co-defendant Davidson because it had occurred "right in front of his house." He told Ms. Sutton to return because he had some clothes for her. Later that day, Ms. Suttles and Ms. Pressley drove Ms. Sutton to the residence to retrieve the clothes from co-defendant Davidson, as well as her make-up bag.

When she entered the house, the front door to the porch was open, and the blanket that covered the front door was pulled aside. Appellant was seated in a chair by the kitchen door, "twiddling his thumbs," and George Thomas was seated in a chair beside the entertainment center in the living room, "rolling a blunt." Neither man spoke to her, which was unusual. Due to the floor plan of the residence, Ms. Sutton had to walk through the north bedroom to access the bathroom, where her make-up bag was located. The door was locked. She did not hear any voices, but she assumed a female was in there. She heard something fall into the sink and heard water running, but nothing else. In an attempt to gain entry to the bathroom through alternate means, Ms. Sutton retraced her steps and tried to walk through the kitchen and around to the bathroom through the other bedroom, but co-defendant Davidson grabbed her and would not let her pass through the kitchen. While there, Ms. Sutton saw a gas can and a trash can in the kitchen, which were out of place. She walked back to the porch, where he gave her the clothing in a Sears bag. He also tried to give her money, but she refused.

Once Ms. Sutton entered the vehicle, she looked through the bag of clothing and realized that the items were not new and were not her size. Ms. Sutton later called co-defendant Davidson to ask about the items he had given her. He visited the apartment, arriving in a Toyota 4-Runner with a Tennessee sticker and a North Face sticker on the rear window. She returned all of the items except for a pair of jeans that she gave Ms. Pressley.

Monday night, the three women granted co-defendant Davidson permission to spend the night at the apartment. He was wearing a pair of black and silver Nike tennis shoes, which were identified as having belonged to C.N. On Tuesday, Ms. Sutton's mother called her, which prompted Ms. Sutton to look through co-defendant Davidson's jacket. There, she found a small black revolver and subsequently demanded that he leave the apartment.

Vincent Wernimont met co-defendant Davidson in prison. After they were released, co-defendant Davidson stayed at Mr. Wernimont's residence until he moved into the house

on Chipman Street. Appellant visited on occasion. Around January 8, 2007, appellant, co-defendant Thomas, and co-defendant Coleman visited him. Appellant stated that co-defendant Davidson was acting "crazy" and that he indicated he had committed sexual offenses against a young woman and had thrown her in a trash can. Mr. Wernimont did not believe appellant's account but rather thought that the two brothers were having an argument. Appellant said that he wanted to go home to Kentucky but that he needed a ride. Mr. Wernimont arranged a place for appellant to spend the night and a ride to Kentucky the next day. He subsequently saw on the news that the victims had been killed, and he called the police. During his interview with police, appellant called Mr. Wernimont's cellular telephone, which was how law enforcement tracked appellant to Kentucky.

Natosha Hays lived in Lebanon, Kentucky, at the time of these offenses and was friends with co-defendant Coleman and appellant. After returning from Knoxville, appellant, co-defendant Coleman, Ms. Lawson, and co-defendant Thomas visited her house, and co-defendant Coleman and appellant spent the night. The following day, she received a telephone call from law enforcement advising her to exit her residence quickly. Police then entered and took appellant into custody.

Law enforcement officers participating in apprehending appellant and other co-defendants drove to Kentucky on January 10, 2007, to make arrests on January 11. After appellant was arrested, officers searched Ms. Hays's residence. In the room where co-defendant Coleman and appellant had slept, they found co-defendant Coleman's purse, which contained paperwork with her own name and C.C.'s name. They also accessed Ms. Hays's computer and observed that Knoxville news websites had been accessed recently. During a search of the residence at Chipman Street, they found pink ladies' high heel shoes that belonged to C.C., together with bleach bottles in the kitchen cabinet.

Investigator Steve Still of the KPD testified about a statement given by appellant. According to appellant, he, co-defendant Davidson, and Eric Boyd drove to an apartment complex for someone to meet a girl. When they arrived at Washington Ridge, they saw an SUV and a male talking to the female who was seated in the driver's seat. Appellant said that co-defendant Davidson and Mr. Boyd "basically car-jacked them" and ordered appellant to drive the vehicle in which they had been riding back to Chipman Street. He stated that when they arrived at the residence, co-defendant Davidson took the female into a bedroom while Mr. Boyd drove away with the male. When Mr. Boyd returned sometime thereafter, the male was no longer with him. Investigator Still asked appellant if he had engaged in sexual intercourse with the female, and he denied doing so.

Randall Nelson, an analyst with the trace evidence unit of the TBI's crime laboratory, testified as an expert witness and stated that he found bleach residue on the white tank top that C.C. had been wearing on the night she disappeared.

Jennifer Millsaps, a special agent/forensic scientist with the TBI, was accepted as an expert by the court in the fields of forensic serology and DNA analysis. She examined a striped sweater and a white tank top from C.C. that each contained a mixture of DNA from C.C. and from appellant, in the form of spermatozoa. She also analyzed the pair of jeans that C.C. had been wearing and located five stains, two of which matched the DNA profile of co-defendant Davidson, one of which matched the DNA profile of appellant, and two of which were blood stains originating from C.C. Ms. Millsaps analyzed oral swabs taken from C.C. during the autopsy and found sperm cells that were "consistent with" appellant's DNA profile but not conclusive. Vaginal and rectal swabs taken from C.C. matched co-defendant Davidson's DNA profile. Agent Millsaps analyzed rectal swabs taken from C.N. during the autopsy and found the presence of semen, but no sperm cells; thus, she could not isolate DNA for comparison.

Agent Millsaps examined fourteen pieces of floral fabric that contained multiple stains, on which she located DNA from the following individuals: C.C., co-defendant Coleman, and appellant. She conceded that if appellant and co-defendant Coleman engaged in sexual intercourse on the floral fabric sheets, it would not be unusual to find a combination of their DNA thereon.

Dr. Darinka Mileusnic-Polchan, who performed the autopsies of the victims, indicated that the evidence established that C.N.'s body was burned after he died. She confirmed that C.N. had a blindfold over his eyes and a sweatshirt covering much of his head, in addition to "bondage" and ties around his wrists and ankles. The sweatshirt appeared to have a string through the neck or hood that was cinched at the back of C.N.'s neck. A sock had been placed in his mouth as a gag.

When Dr. Mileusnic-Polchan performed an x-ray, she observed three projectiles in C.N.'s body, one in his head, one in his neck, and one close to his spine where it met his chest area. The gunshot wound to C.N.'s head was located on the right side of his head, above his ear, and Dr. Mileusnic-Polchan classified it as a contact wound. This gunshot, she opined, was the injury that killed C.N. The wound to C.N.'s neck was in the back, at the junction of the neck and upper back, but she could not discern whether the wound was contact, close range, or distant. The third bullet entered C.N.'s back, fractured his spine at the sixth and seventh vertebrae, and damaged the spinal cord; this wound would have disabled C.N.

Dr. Mileusnic-Polchan also noted "tremendous charring, blistering" on C.N.'s body, which indicated to her "almost like a flash, very hot and . . . fast fire that was engulfing the body and burned it." She reported that his anal/rectal area was bruised and swollen and that there was blood coming from inside the region. She opined that the damage was caused by "forceful penetration, . . . possibly an object," due to the severity of the injury. Based on the presence of certain cell types, Dr. Mileusnic-Polchan stated that C.N. died within a couple of hours after the injury was inflicted. From the extensiveness of the methods used to bind and gag C.N. and the severity of the injuries he sustained, Dr. Mileusnic-Polchan found it "hard . . . to believe that just one person would do all of that." She did not locate any defensive wounds on C.N.'s body. Dr. Mileusnic-Polchan concluded that the manner of death was homicide and the cause of death was multiple gunshot wounds.

With regard to C.C., Dr. Mileusnic-Polchan responded to the scene where the body was found. When she first arrived, she observed a large plastic garbage can with a lid. The can was distorted by the weight of C.C.'s body pressing against the sides. There were also bedsheets and pillow shams in the garbage can. They removed the can intact and transported it to the forensic center. Upon examination, Dr. Mileusnic-Polchan ascertained that C.C.'s head had been covered with a garbage bag that was tied off behind her head. Moreover, her body had been placed in five layers of garbage bags before being placed in the can. A series of ligatures had been utilized to keep her body in "almost . . . a fetal position" with her anal/genital area exposed.

When Dr. Mileusnic-Polchan removed C.C.'s body, she noted that blood was emanating from an injury in that region. C.C.'s body exuded an "unusual kind of chemical smell mixed with early decomposition smell . . . [,] kind of a chemical decomposition, so to speak," which Dr. Mileusnic-Polchan acknowledged could have been caused by someone pouring bleach into C.C.'s mouth. C.C. also had an injury to the frenulum, the tissue that connects the lip to the gums, which could have been caused by inserting something, such as a penis, into her mouth. Examining lividity, Dr. Mileusnic-Polchan could ascertain that C.C. actually died inside the garbage can and that she had been in the can for perhaps a day before being found. Observing the cyanotic coloring of C.C.'s face, Dr. Mileusnic-Polchan opined that C.C. died from asphyxia, or a lack of oxygen, which would have been a "relatively slow death." There was no evidence of strangulation, and Dr. Mileusnic-Polchan found no signs of a struggle on C.C.'s body.

Dr. Mileusnic-Polchan observed bruising around C.C.'s anus and vagina, as well as such extensive bruising in the region that a hematoma had formed. She opined that the damage was "true blunt trauma, . . . beating," and characterized the injury as being "much more" than what would result from "your usual intercourse or rape." By examining the areas of injury, Dr. Mileusnic-Polchan surmised that C.C. survived only a couple of hours after the

-11-

final injury hematoma occurred, which was sometime in the afternoon of Sunday, January 7. Comparison of the types of cells present in the injury to C.C.'s mouth and to her anal/genital area, Dr. Mileusnic-Polchan stated that the oral rape occurred prior to the infliction of the other injuries. Dr. Mileusnic-Polchan concluded that the manner of death was homicide and the cause of death was asphyxial death, or lack of oxygen. C.C. would have died between three and five minutes after being positioned in a cramped posture inside five layers of garbage bags, having the bag placed over her head, and being covered with other materials and the garbage can lid.

Appellant testified on his own behalf. He stated that he, co-defendant Coleman, co-defendant Thomas, and Ms. Lawson visited co-defendant Davidson for the New Year's holiday in January 2007. The weekend after New Year's Day, co-defendant Davidson "beat . . . up" his girlfriend, Ms. Sutton, and she left. Appellant and co-defendant Davidson were going to walk to the store, and they left the residence together. As they walked outside, they encountered Eric Boyd. Boyd drove co-defendant Davidson and appellant to an apartment complex to meet a female.

As they drove, the men shared a "wet blunt," which is marijuana that had been soaked in embalming fluid and then dried before rolling it into a cigarette. When they arrived at the apartment complex, Mr. Boyd identified the apartment he wanted to visit, stopped the vehicle, and placed it in park; however, he did not turn off the ignition. Boyd looked at co-defendant Davidson, and they exited the vehicle. They approached an SUV where a female, C.C., was seated in the driver's seat with the door open, "hugging or kissing" a male, C.N., who was standing beside the SUV. According to appellant, co-defendant Davidson and Boyd car-jacked the two people and instructed appellant to follow them back to co-defendant Davidson's residence.

Appellant said that when they arrived, he walked into the house and instructed co-defendant Thomas to gather his belongings because he did not want to be there. Co-defendant Davidson and Boyd then entered; Boyd was holding C.N.'s arm, who was blindfolded and whose hands were bound behind him, while co-defendant Davidson held C.C., who had been blindfolded, hooded, and bound. Appellant stated that he went into the bedroom and instructed co-defendant Coleman to gather her belongings but not to let co-defendant Davidson know what she was doing. He maintained that he began to feel the effects of the "wet blunt" because he had never smoked one before. He said that co-defendant Davidson told him that the only way they could convince appellant to join them that evening was to tell him there was a girl co-defendant Davidson wanted him to meet. Co-defendant Davidson instructed appellant, co-defendant Coleman, and co-defendant Thomas to come into the living room because they were "too quiet," and he was becoming "paranoid." When appellant told co-defendant Davidson that they were leaving, co-

defendant Davidson pulled a gun from his pocket and threatened to shoot, but not kill, appellant. He stated that he did not like co-defendant Thomas anyway and that he did not want to have to shoot co-defendant Coleman.

Appellant reported that co-defendant Davidson took co-defendant Thomas aside and told him he would have to do something to earn his trust, whereupon the two men left the residence together. During that time, appellant said that he checked on C.C., who was tied up in a bedroom, and released some of the bindings, gave her water, and assisted her in smoking a cigarette. He told her that they were being held against their will, as well. Appellant maintained that C.C. asked him to convince co-defendant Davidson to release her. Appellant testified that with his girlfriend in the next room, he forced C.C. to perform oral sex on him, and as he began to ejaculate, he heard a noise that "spooked" him, causing semen to deposit on C.C.'s shirt and pants. He dressed himself, tied C.C. back as he had found her, and sat in the living room with co-defendant Coleman.

Shortly thereafter, co-defendant Thomas and co-defendant Davidson returned, and co-defendant Thomas looked "crazy." They left again, and this time they were gone for an hour and a half to two hours. When they returned, they had dark stains on their clothes. At some point, Boyd returned without C.N. Appellant made the assumption that they had driven C.N. to an ATM and forced him to withdraw money, then left him tied up in a remote location. He did not think they had killed him. Co-defendant Davidson went into his bedroom and locked the deadbolt lock for the remainder of Saturday night. On Sunday, two people visited the residence for a brief period. Sunday evening, co-defendant Davidson exited his bedroom with C.C., who was naked from the waist down. Appellant stated that co-defendant Davidson forced all of them to go into the kitchen, where co-defendant Davidson attempted to strangle C.C. She fell to the floor. Appellant and Ms. Coleman left the room, but co-defendant Davidson instructed co-defendant Thomas to remain in the kitchen. Co-defendant Davidson bound C.C. in the fetal position and placed her in the garbage can.

Co-defendant Davidson instructed them to go into the back bedroom, and he placed a telephone call. In the early morning hours of Monday, co-defendant Davidson left the residence, and appellant declared that they were leaving. They walked to "Vince's" house. From there, appellant, co-defendant Coleman, and co-defendant Thomas spent the night at a female's residence and drove to Kentucky the following day, where they stayed at Ms. Hays's house. He claimed that before he could contact police about what had occurred, law enforcement surrounded Ms. Hays's house and arrested him and others. Appellant then rested his case.

The jury deliberated and returned guilty verdicts as follows: Counts 1, 2, 5, 6, 10, 13, 14, and 17 — guilty of the lesser-included offense of facilitation of first degree murder of

C.N.; Counts 3, 4, 7, 8, 12, 15, 16, and 18 — guilty of first degree murder of C.C.; Counts 19, 20, 45, and 46 — guilty of especially aggravated robbery of both victims; Counts 21, 22, 23, and 24 — guilty of especially aggravated kidnapping of C.C. and facilitation of especially aggravated kidnapping of C.N.; and Counts 33-38 and 42-44 — guilty of aggravated rape of C.C. The jury found appellant not guilty of Counts 9 and 11 (first degree murder of C.N.) and 26, 27, and 29 (aggravated rape of C.N.).[3]

## B. Penalty Phase

The trial court conducted the penalty phase of the trial on August 26, 2009. The court determined that based on the evidence at trial, the State had presented sufficient evidence to submit the following three aggravating factors to the jury: (1) the murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) the murder was knowingly committed, solicited, directed or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb. *See* Tenn. Code Ann. § 39-13-204(i)(5)-(7). The State presented G.C. and D.C., C.C.'s father and mother, as witnesses to deliver victim impact statements. Appellant presented the testimony of LaTrossica Davidson, appellant's oldest sister; LaQuitta Boddie, appellant's younger sister; LaKendria Davidson, appellant's younger sister; LaKisha Young, appellant's cousin; Theresa Hullum, appellant's cousin; Essie Farmer, appellant's cousin; and Dr. James Murray, a licensed clinical psychologist.

The jury unanimously found that the State had proven the following aggravating circumstances for appellant's first degree felony murder and premeditated murder convictions: (1) the murder was especially heinous, atrocious, and or cruel in that it involved the torture or serious physical abuse beyond that necessary to produce death; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another; and (3) the murder was knowingly aided by the defendant, while the defendant had a substantial role in committing the rape of C.C. by oral penetration, the kidnapping of C.C., the robbery of C.C., and the robbery of C.N. *See id.*

---

[3] Prior to trial, the court merged count 25 with 26; count 28 with 29; count 30 with 33; count 31 with 34; count 32 with 35; count 39 with 42; count 40 with 43; and count 41 with 44. Thus, the merged counts of the indictment are not included in the summary of the jury's verdicts.

However, the jury determined that these aggravating circumstances did not outweigh the mitigating circumstances beyond a reasonable doubt and imposed a sentence of imprisonment for life without the possibility of parole.

## C. Sentencing Hearing on Non-Capital Offenses

The trial court subsequently held a sentencing hearing regarding appellant's non-capital criminal convictions. The trial court fixed appellant's sentences as follows: facilitation of first degree murder, twenty-five years; especially aggravated robbery, two counts, twenty-five years each (concurrently with each other); especially aggravated kidnapping (C.C.) and facilitation of especially aggravated kidnapping (C.N.), twenty-five years and twelve years, respectively (concurrently with each other); and aggravated rape, three counts, twenty-five years each (concurrently with each other). The trial court aligned each group of offenses consecutively to each other, resulting in an effective sentence of one hundred years. The facts presented at the sentencing hearing, the arguments of the parties, and trial court's ruling will be summarized fully below in conjunction with the sentencing issues raised in this appeal.

## D. Procedural History

Before appellant's motion for new trial was heard, former Judge Richard Baumgartner, who presided over the trial, resigned after pleading guilty to one count of official misconduct. Senior Judge Jon Kerry Blackwood, the successor judge, determined that appellant was entitled to a new trial because the original trial judge's misconduct constituted structural constitutional error. *See State v. Letalvis Cobbins*, No. E2012-00448-SC-R10-DD, at 3 (Tenn. May 24, 2012) (Order). The successor judge also concluded, after reversing his earlier determination, that he could not perform the thirteenth-juror review because, in part, the credibility of the original trial judge had been called into question by his misconduct outside the courtroom. *Id.* at 2. The Tennessee Supreme Court reversed the successor trial judge's decisions and remanded the case back to the trial court for the successor trial judge to determine whether he would be able to fulfill his duty to perform thirteenth-juror review. *Id.* at 2.

After further proceedings in the trial court, Senior Judge Blackwood initially approved the verdicts as thirteenth juror but granted each defendant a new trial based on the out-of-court misconduct by Judge Baumgartner. *State v. Letalvis Cobbins,* No. E2012-02025-CCA-10B-DD, 2012 WL 5266427, at *4 (Tenn. Crim. App. Oct. 25, 2012), *perm. app. denied* (Tenn. Feb. 12, 2013). However, Senior Judge Blackwood subsequently rescinded his previous approval of appellant's verdicts, stating that after delving further into the investigative files regarding Judge Baumgartner, there was "no way" that he could approve

any of the verdicts as thirteenth juror. *Id.* Following this order, the State filed a motion to recuse, which Senior Judge Blackwood denied. *Id.* at *8, *10. The State pursued a Rule 10 "accelerated interlocutory appeal" from the denial of its motion. *Id*. at *16. This court reversed Senior Judge Blackwood's denial of the State's motion to recuse, *id*. at *24, and Senior Judge Walter Kurtz was subsequently designated as successor judge. Senior Judge Kurtz affirmed the jury verdict as the thirteenth juror and denied appellant's motion for new trial. This appeal follows.

## II. Analysis

Appellant raises seven issues for our review in this appeal: (1) whether misconduct of the trial judge constituted structural constitutional error; (2) whether the trial court erred in denying appellant's motion for a change of venue; (3) whether the trial court erred in admitting certain photographs; (4) whether the trial court erred in denying appellant's motion to continue; (5) whether the trial court erred in allowing testimony concerning a firearm that appellant had possessed prior to the offense date; (6) whether the trial court erred in allowing family members to wear buttons with the victims' likenesses; and (7) whether the trial court erred in imposing an effective sentence of life in prison without the possibility of parole plus one hundred years for appellant's non-capital offenses.

## A. Misconduct of Trial Judge

Appellant contends that the original trial judge's misconduct outside the courtroom amounted to structural constitutional error entitling him to a new trial. The State responds that the Tennessee Supreme Court previously decided this issue and that its decision constitutes the "law of the case."

"Structural constitutional errors are errors that compromise the integrity of the judicial process itself." *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) (citing *State v. Garrison*, 40 S.W.3d 426, 433 n.9 (Tenn. 2000)). A structural error "necessarily render[s] a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *Neder v. United States*, 527 U.S. 1, 9 (1999). "Structural constitutional errors are not amenable to harmless error review, and therefore, they require automatic reversal when they occur." *Rodriguez*, 254 S.W.3d at 371 (citations omitted).

Under the "law of the case" doctrine, "when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case, which must be followed upon remand." *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003). An issue decided in a prior appeal may only be reconsidered when (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial

proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal. *Id.* Appellant has failed to establish that the Tennessee Supreme Court's order may be reconsidered. Specifically, appellant failed to make any showing that the original trial judge's misconduct outside the courtroom affected the integrity of his trial. Accordingly, the Tennessee Supreme Court's previous ruling is the law of the case, and appellant is not entitled to relief regarding this issue.[4]

## B. Change of Venue

Appellant requested a change of venue prior to his trial, and in response, the trial court granted a change of venire to Davidson County so that the jury would be selected from Davidson County instead of Knox County. This, he posits, is tantamount to an abuse of discretion. We disagree.

"The decision of whether to grant a motion for a change of venue based on pretrial publicity . . . will not be reversed on appeal unless the trial court abused its discretion." *State v. Crenshaw*, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001) (citing *State v. Howell*, 868 S.W.2d 238, 249 (Tenn. 1993)). Before a conviction will be overturned, an appellant must show that the jurors who heard his case were biased or prejudiced against him. *Id.* (citing *State v. Melson*, 638 S.W.2d 342, 360-61 (Tenn. 1982)). "The test is 'whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity.'" *Id.* (quoting *State v. Kyger*, 787 S.W.2d 13, 18-19 (Tenn. Crim. App. 1989)).

In this case, the trial court declined to change the venue of the trial but granted a change of venire. The authority for a trial court to order a change of venue or venire is codified in Tennessee Code Annotated section 20-4-201, which states:

(1)     The venue may be changed, at any time before trial, upon good cause shown, as prescribed in this part; or

(2)     A court may issue an order for a special venire of jurors from another county if in its discretion it determines the action to be necessary to ensure a fair trial.

---

[4] Appellant also incorporates this issue as a basis for relief in several of the remaining claims of error. Having addressed this issue in general terms, we decline to address it further in the context of specific claims of error.

The statute is silent as to the conditions under which a trial court *must* order a requested change of venue as opposed to a change of venire. Addressing a similar argument in *State v. Thomas Dee Huskey*, this court opined that while

> selecting a jury from another county and returning it to the county where the defendant was indicted increases the possibility of the jury being exposed to prejudicial information, this procedure has been expressly approved by our supreme court and our legislature. The defendant does not allege, and the record does not reflect, that the jurors actually selected were unfair or unbiased or that the court officers acted improperly or influenced the jury in any way. Therefore, we conclude that the trial court properly ordered a special venire from Hamilton County as authorized by Tenn. Code Ann. § 20-4-201(2) and [*State v.*] *Nichols*[, 877 S.W.2d 722, 728-29 (Tenn. 1994)].

No. E1999-00438-CCA-R3-CD, 2002 WL 1400059, at *108 (Tenn. Crim. App. June 28, 2002).

Likewise, in this case appellant has failed to allege, and the record does not reflect, that any of the jurors who were selected to hear his case were biased in any way, that they were exposed to prejudicial information, or that court officers influenced the jury. Appellant received that for which he asked – an untainted venire from another county. The fact that the trial itself occurred in Knox County does not negate that or suggest an abuse of discretion. Appellant has provided no evidence by which we could determine that the actual venue of the trial impacted the jury's verdict or biased any juror against him. Appellant is not entitled to relief.

### C. Photographs

The trial court held a hearing on appellant's motion in limine to limit or exclude several questioned photographs and allowed several but denied admissibility of several others. Appellant now challenges several photographs that were received into evidence in this case, all but one of which were taken during the autopsies of the victims. While he characterizes the photographs as "shocking," appellant does not address each photograph individually with an argument as to why it should not have been admitted. Rather, he alleges that the photographs were "of questionable probative value" and that any "minimal probative value [was] outweighed by substantial prejudice." Appellant asserts that the medical examiner could have explained the nature of the injuries without photographic aid or could have utilized black and white photographs or diagrams to assist in her testimony, thus decreasing the "shock value" of the photographs. He also seems to contest the method of display, stating that the photographs were either enlarged or projected onto a large screen for

-18-

viewing by the jury.  Finally, to bolster his position, appellant cites to the dismissal of a female juror who became so "horrified" by the images that she could no longer sleep alone in her hotel room and to an incident relating to co-defendant Davidson's trial that is not a part of this record.

The first challenged photograph was admitted as Exhibit 21 and is a photograph of C.N., depicting his body as it was found along the train tracks, naked and partially charred. This photograph was introduced through Mr. Ford, who first discovered C.N.'s body.  The remainder of the photographs contested by appellant were introduced through the testimony of the medical examiner.  Although appellant merely lists the exhibit number and a citation to the record corresponding to when they were admitted, he includes neither a description of each photograph nor the basis for his objection.[5]  We set forth a description of the photographs as follows:

| Exhibit 216: | A close-up photograph of C.N.'s feet and ankles, showing the belt that bound his ankles and charring of his lower legs |
| --- | --- |
| Exhibit 217: | A closer view of Exhibit 21, showing in more detail the wrapping around C.N.'s head and the charring of his nude body |

---

[5]  In *State v. Brock*, 327 S.W.3d 645, 696-97 (Tenn. Crim. App. 2009), this court reviewed the admissibility of seventeen photographs to which appellant objected at trial.  We noted:

> For his argument with regard to the other seventeen photographs, Appellant directs the Court to the Appendix of his brief where he included a chart setting out the pre-trial exhibit number, the trial exhibit number, a description of each picture, whether the picture is of the autopsy or the crime scene and finally the basis of his objection to the photograph, i.e., "Cumulative," "Unduly Prejudicial/Cumulative," or "Relevance." This chart included in an Appendix to Appellant's brief does not "set[ ] forth the contentions of the appellant with respect to the issues presented, and the reasons therefor, including the reasons why the contentions require appellate relief . . . " as is required by Rule 27(a)(7) of the Tennessee Rules of Appellate Procedure.  Therefore, we conclude that Appellant has waived this issue with regard to the remaining seventeen pictures to which he objected. *See* Tenn. Ct. Crim. App. R.10(b).

*Id.*; *see also State v. Sanders*, 842 S.W.2d 257 (Tenn. Crim. App. 1992) (applying waiver where defendant cited no authority to support his complaint).  Accordingly, for his failure to set forth his contentions as to why admission of these photographs requires appellate relief, appellant has waived this issue.  Waiver notwithstanding, due to the seriousness of the offenses and the likelihood of further appellate review, we will nonetheless address the merits of appellant's issue in this opinion.

Exhibit 218:     A close-up photograph of C.N.'s head pictured as it was when the body was found, covered with a hood and burned

Exhibit 219:     A side-view photograph of C.N. on the autopsy table, positioned on his back

Exhibit 220:     A side-view photograph of C.N. on the autopsy table, positioned on his stomach

Exhibit 221:     A close-up photograph of C.N. on the autopsy table, detailing his head and neck before the hood was removed

Exhibit 222:     A close-up photograph of C.N. on the autopsy table, detailing his head and neck after the hood had been removed and showing the gag and blindfold

Exhibit 226:     A close-up photograph of the gunshot wound to C.N.'s head

Exhibit 227:     A close-up photograph of the gunshot wound to C.N.'s head, internal view

Exhibit 229:     A close-up photograph of the gunshot wound to C.N.'s neck

Exhibit 231:     A photograph depicting the entry wound of the gunshot to C.N.'s back

Exhibit 232:     A photograph depicting the entry wound of the gunshot to C.N.'s back

Exhibit 233:     A close-up photograph depicting the entry wound of the gunshot to C.N.'s back

Exhibit 234:     A further close-up photograph depicting the entry wound of the gunshot to C.N.'s back

Exhibit 236:     A photograph depicting the injuries to C.N.'s anus

Exhibit 237:      A close-up photograph of C.N.'s feet and ankles, bound with a leather belt

Exhibit 239:      A close-up photograph of C.N.'s feet and ankles, bound with a leather belt, taken from another angle, showing the debris on the soles of his feet

Exhibit 247:      A photograph of C.C.'s body depicting its removal from the garbage can

Exhibit 248:      A photograph of C.C.'s body as it was positioned inside the garbage can when it was recovered

Exhibit 249:      A closer photograph of C.C.'s body as it was positioned inside the garbage can when it was recovered, depicting her head covered with a plastic garbage bag

Exhibit 250:      A photograph of C.C.'s body as it was positioned when it was removed from the garbage can, depicting the settling of blood after she died and showing the manner in which her body was bound

Exhibit 251:      An alternate view of Exhibit 250, showing C.C.'s face

Exhibit 252:      A photograph of C.C.'s body positioned on the autopsy table

Exhibit 253:      A close-up photograph of C.C.'s body, focusing on her face

Exhibit 254-55:   Close-up photographs of C.C.'s eyes, demonstrating debris or "an artifact" found in the eyes and indicating that when C.C. died, her eyes were open

Exhibit 256:      A close-up photograph of C.C.'s mouth, showing an injury to the inside of her mouth

Exhibit 257:      A close-up photograph of C.C.'s neck, reflecting bruising

Exhibits 258-262: Close-up photographs of C.C.'s hands

-21-

Exhibits 263-64:    Close-up photographs of C.C.'s genital area, depicting the extent of her injuries

Tennessee Rules of Evidence 401, 402, and 403 govern the admissibility of the photographs in this case. *See State v. Banks*, 564 S.W.2d 947, 949-51 (Tenn. 1978). First, a witness with knowledge of the facts must verify and authenticate a photograph before it can be admitted into evidence. *Id.* at 949; Tenn. R. Evid. 901. Next, a trial court must determine whether the photograph is relevant. *Id.*; *see* Tenn. R. Evid. 401. Irrelevant evidence is inadmissible. Tenn. R. Evid. 402. If the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence," it is relevant. Tenn. R. Evid. 401. Once it determines that a photograph is relevant, the trial court must then determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. *See* Tenn. R. Evid. 403; *Banks*, 564 S.W.2d at 950-51. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Adv. Comm. Note). Furthermore,

> A trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a *prima facie* case of guilt or to rebut the defendant's contentions.

*State v. Leach*, 148 S.W.3d 42, app. 63 (Tenn. 2004) (citing *Banks*, 564 S.W.2d at 951).

The decision whether to admit the photographs rests within the trial court's sound discretion, and we will not reverse the trial court's determination absent a clear showing of an abuse of that discretion. *Banks*, 564 S.W.2d at 949; *see also State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Stinnett*, 958 S.W.2d 329, 331 (Tenn. 1997); *State v. Dickerson*, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993). Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. *See Banks*, 564 S.W.2d at 949.

"Graphic, gruesome, or even horrifying photographs of crime victims may be admitted into evidence if they are relevant to some issues at trial and probative value is not outweighed by their prejudicial effect." *Brock*, 327 S.W.3d at 694 (citing *Banks*, 564 S.W.2d at 949-51). Autopsy photographs must never be used "solely to inflame the jury and prejudice them against the defendant" and must be relevant to prove some material aspect of the case. *Banks*,

564 S.W.2d at 951 (citing *Milam v. Commonwealth*, 275 S.W.2d 921 (Ky. 1955)). However, "'if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant.'" *Brock*, 327 S.W.3d at 694 (quoting *Banks*, 564 S.W.2d at 951). "Photographs of a corpse are admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character, and photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *State v. Derek Williamson*, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011) (citing *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)), *perm. app. denied* (Tenn. Dec. 14, 2011).

In her testimony, Dr. Mileusnic-Polchan utilized each of the photographs to explain the injuries inflicted upon the victims. In situations where a wider photograph was admitted, followed by a close-up, her testimony referenced the wider photograph in terms of orientation of the injury then focused on the close-up photograph in describing the details of the injury. Only one photograph actually depicted an "autopsy" *per se*, that is, an internal view of a wound, and that photograph was necessary due to the amount of charred skin surrounding the wound.

As to appellant's argument that black and white photographs could have been utilized instead, we note that in the *Brock* case, Dr. Mileusnic-Polchan, the medical examiner who performed the autopsies of the victims in this case, testified that a "color photograph is definitely a better objective way of indicating the injury," citing the blending of non-injured areas with the injured areas in black and white or "gray scale" pictures. *Brock*, 327 S.W.3d at 695. Moreover, Dr. Mileusnic-Polchan testified in *Brock* that although she would be able to explain an injury without reference to a picture, she questioned whether a jury could "understand and perceive the significance" of an injury without a visual aid, *id.*, thus leading to the *Brock* trial court's ruling that the contested color photographs were admissible.

With regard to the enlarged and projected photographs, while we are unable to locate specific rulings by Tennessee courts regarding enlargements or projection of photographs, we note that several states have concluded that no error ensues from the use of those methods of publication. *See Stewart v. State*, 690 S.E.2d 811, 813-14 (Ga. 2010) (noting that "the use of projectors to display undistorted photographs, including pre-autopsy photographs, to the jury is an accepted method of publication at trial"); *Ottis v. State*, 496 S.E.2d 264, 269 (Ga. 1998) (concluding that projection method for presenting photographs of murder victim is "permissible absent distortion or disproportion of what is depicted"); *Watts v. State*, 733 So. 2d 214, 234 (Miss. 1999) (determining that autopsy photographs were admissible, even though some were enlarged, because all had significant evidentiary value, none were gruesome or inflammatory, and photographs were not overdramatized by enlargement since

without enlargement much of the relevant detail would not be easily discernible); *Banks v. State*, 643 S.W.2d 129, 134 (Tex. Crim. App. 1982) (holding that the "fact that [photographs] may have been enlarged does not render them inadmissible unless the sole purpose in the enlargement is to inflame the minds of jury"). We cannot conclude that the trial court abused its discretion in admitting the aforementioned photographs in this case, notwithstanding the effect it had on one of the jurors. Appellant is not entitled to relief on this issue.

## D. Motion for a Continuance

Appellant contends that the trial court erred by denying his motion to continue the trial. Although he cites the record on appeal, he fails to set forth the standard of review and citations to the record in his brief. Appellate briefs *shall* contain "the contentions of the appellant with respect to the issues presented, . . . including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record . . . relied on; and . . . for each issue, a concise statement of the applicable standard of review." Tenn. R. App. P. 27(a)(7). In light of his failure to properly present this issue for our review, we conclude that he has waived appellate review of the trial court's denial of his motion to continue. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); *see also Berry v. State*, 366 S.W.3d 160, 169 (Tenn. Crim. App. 2011). However, due to the seriousness of the offenses in this case and the likelihood of further appellate proceedings, we will address the merits of this issue to facilitate said review.

The decision of whether to grant a continuance is left to the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion and prejudice to the defendant. *State v. Vaughn*, 279 S.W.3d 584, 598 (Tenn. Crim. App. 2008) (citing *State v. Blair*, 145 S.W.3d 633, 640 (Tenn. Crim. App. 2004); *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004)). On appeal, appellant bears the burden of demonstrating that harm ensued from the denial of the requested continuance. *Id.* (citations omitted); *see also Baxter v. State*, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973). An appellant may demonstrate an abuse of discretion by establishing that he was denied a fair trial or that one could reasonably conclude that a different result would have been reached had the motion been granted by the trial court. *Id.* (citing *State v. Thomas*, 158 S.W.3d 361, 392 (Tenn. 2005); *State v. Goodwin*, 909 S.W.2d 35, 44 (Tenn. Crim. App. 1995)).

In his brief, appellant asserts that the requested continuance was necessary "to conduct an independent investigation of relevant matters," namely additional DNA testing of "critical evidence." He further states that "in addition to DNA testing, there existed independent necessary grounds," although he does not specifically name any such ground. Moreover,

appellant posits that it is "impossible to know the result of [his] trial had the defense had the time to complete their DNA testing and investigation into other areas" of importance in the case. These statements are insufficient to demonstrate that he was denied a fair trial or that one could reasonably conclude that the result of the trial would have been different. Appellant is not entitled to relief.

### E. Testimony Regarding a Gun Seen in Appellant's Possession but Not Involved in Crimes

The State sought to introduce testimony pertaining to a gun that appellant possessed shortly before the crimes in this case were committed. The gun was later recovered at the home of Natosha Hays, where appellant and Ms. Coleman had spent the night following the crimes. The trial court heard the testimony of Stacy Lawson in a jury-out hearing, during which she indicated that she had seen appellant in possession of a silver revolver during her second trip to Knoxville with the group but not during the third trip. She also testified that appellant had told her that co-defendant Davidson displayed two weapons to him and gave him the choice of ownership between the two. Although the weapon had not been linked, either forensically or by eyewitness testimony, to the crimes, the State sought admission of the testimony to rebut appellant's position at trial, wherein he attempted to distance himself from co-defendant Davidson and portray co-defendant Davidson as the primary offender. In this appeal, appellant challenges the admission of the testimony on the grounds that it was "either not relevant or was remotely relevant . . . [and] served only to prejudice the jury or confuse the issues."

Following the hearing, the trial court ruled that the gun in question bore very little nexus to the actual crimes in the case. However, it noted that appellant had "made great issue" about how he was "a follower . . . , that he was influenced by his brother, that his brother's the bad actor, that . . . but for the actions of his brother, . . . he would not have been involved in this, and that . . . he didn't have the courage to stand up to him . . . and . . . was scared of him." In that regard, the trial court found appellant's possession of the weapon to be relevant because the circumstances leading to it involved the dynamics of the relationship between co-defendant Davidson and appellant. The trial court disallowed testimony concerning how and when the weapon was recovered by law enforcement officers because it lacked relevance to the case. The court reiterated that appellant's possession of the revolver was relevant only to whether he was intimidated by his brother, citing appellant's position at trial that he was afraid of his brother and was a "follower" because he was intimidated by him. Thus, the circumstances by which appellant came into possession of the gun were relevant to dispute appellant's position.

-25-

The determination of whether evidence is relevant and admissible at trial is a matter left to the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *State v. Dellinger*, 79 S.W.3d 458, 485 (Tenn. 2002) (citation omitted); *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996) (citations omitted). "Relevant evidence" is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence is admissible unless specifically excepted by constitution, statute, rules of evidence, or rules of general application. Tenn. R. Evid. 402. One such exception is that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. "Unfair prejudice" is "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Banks*, 564 S.W.2d at 951 (quoting Fed. R. Evid. 403, Adv. Comm. Note).

With regard to this issue, the trial court reviewed the testimony of Ms. Lawson outside of the presence of the jury and determined the parameters of her permissible testimony, ruling that the intended testimony was relevant to dispute appellant's position at trial that he was afraid of his brother and that he was merely a follower. Moreover, the trial court appropriately disallowed further testimony concerning the recovery of the weapon because it had not been linked to the crimes, specifically noting that the State simply wanted to "put the word 'Cobbins' and 'gun' in the same sentence." As the trial court noted, appellant's possession of a gun and the circumstances under which he came to be in possession of it were relevant to rebut his position that he was acting under the domination of his half-brother, co-defendant Davidson. The testimony demonstrated that co-defendant Davidson offered appellant his choice of a weapon and that appellant willingly chose a weapon with which to arm himself. The trial court did not err in permitting this testimony for the limited purpose stated.

### F. Victims' Families Wearing Buttons with Victims' Photographs

Appellant challenges the trial court's decision to allow the immediate family members of the victims to wear buttons bearing a photograph of the victims. Our review of the record indicates that appellant addressed this issue in pretrial motions and hearings, and the trial court, after considering applicable legal authorities, ruled that the buttons could be worn with the following limitations: buttons could only be worn by the victims' parents, grandparents, and siblings; the buttons could be no larger than a three-inch diameter; and the buttons could not be worn by a family member while testifying at trial. Although appellant states in his

-26-

brief that the trial court's guidelines were violated, he does not cite this court to the record in support of this contention, nor did he argue this issue in his motion for a new trial.

In support of his position, appellant cites a Ninth Circuit federal habeas corpus case that found error in the wearing of similar buttons. *See Musladin v. LaMarque*, 427 F.3d 653 (9th Cir. 2005). However, the United States Supreme Court reversed the *Musladin* court, concluding that petitioner was not entitled to habeas corpus relief on that basis. *See Carey v. Musladin*, 549 U.S. 70 (2006). Neither party has presented this court with a Tennessee case deciding this issue on direct appeal, and we are aware of none.

Without question, "[t]rials must be free from a coercive or intimidating atmosphere." *Musladin*, 549 U.S. at 80 (Kennedy, J., concurring); *Moore v. Dempsey*, 261 U.S. 86 (1923); *Frank v. Mangum*, 237 U.S. 309 (1915).

> The rule against a coercive or intimidating atmosphere at trial exists because "we are committed to a government of laws and not of men," under which it is "of the utmost importance that the administration of justice be absolutely fair and orderly," and "[t]he constitutional safeguards relating to the integrity of the criminal process attend every stage of a criminal proceeding . . . culminating with a trial 'in a courtroom presided over by a judge.'"

*Id.* (quoting *Cox v. Louisiana*, 379 U.S. 559, 562 (1965)). However, in legislation known as the "Victims' Bill of Rights," the Tennessee General Assembly "declare[d] that victims and witnesses shall have certain rights in this state and that they shall be made aware of these rights." Tenn. Code Ann. § 40-38-101. Accordingly, courts of this state are cognizant of the rights afforded to victims of crime and often must, as in this case, balance a defendant's right to a fair trial with the victims' rights. Here, the trial court acknowledged that "to provide the defendant with a fair trial, the courtroom atmosphere must be free of coercion or intimidation." Likewise, it also recognized that "[h]ad the victims in this case survived, they would be permitted in the courtroom for trial. In their absence, this Court finds that the immediate family members of the victims may wear the small buttons . . . ." The trial court then outlined the limitations on who could wear the buttons and when they could and could not be worn.

In *Musladin*, the Supreme Court characterized the wearing of buttons by victims' family members as "spectator conduct," *Musladin*, 549 U.S. at 76, in comparison with "government-sponsored practices,"[6] *id.* at 75. In *Williams*, the Court promulgated the

---

[6] Examples of government-sponsored practices are addressed in *Estelle v. Williams*, 425 U.S. 501,
(continued...)

"inherently prejudicial" test for reviewing government-sponsored practices and determined that such practices "must be justified by an 'essential state' policy or interest." *Id.* at 75 (citing *Williams*, 425 U.S. at 505; *Flynn*, 475 U.S. at 568-569). Pursuant to that test, "the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'" *Flynn*, 475 U.S. at 570 (quoting *Williams*, 425 U.S. at 505). The *Musladin* court further noted that "the effect on a defendant's fair-trial rights of the spectator conduct . . . is an open question in our jurisprudence" as evidenced by the various approaches taken by different jurisdictions. *Id.* at 76. Some courts have applied the *Williams* and *Flynn* "inherently prejudicial test" to spectator conduct. *Id.* (citing *Norris v. Risley*, 918 F.2d 828, 830-31 (9th Cir. 1990) (deciding the issue of spectators' buttons under the *Williams* and *Flynn* test to determine whether the defendant was deprived of a fair trial); *In re Woods*, 114 P.3d 607, 616-17 (Wash. 2005) (applying *Flynn* and concluding that spectators' ribbons did not prejudice the defendant)). Some courts have declined to extend *Williams* and *Flynn* to spectators' conduct. *Id.* at 76-77 (citing *Billings v. Polk*, 441 F.3d 238, 246-47 (4th Cir. 2006) (stating that *Williams* and *Flynn* "do not clearly establish that a defendant's right to a fair jury trial is violated whenever an article of clothing worn at trial arguably conveys a message about the matter before the jury"); *Davis v. State*, 223 S.W.3d 466, 474-75 (Tex. App. 2006) ("Appellant does not cite any authority holding the display of this type of item by spectators creates inherent prejudice."). "[O]ther courts have ruled on spectator-conduct claims without relying on, discussing, or distinguishing *Williams* or *Flynn*." *Id.* at 77 (citations omitted). Still other courts have enunciated a different standard — actual prejudice — for reviewing claims involving spectator conduct. *See Allen v. Commonwealth*, 286 S.W.3d 221, 229 (Ky. 2009) (declining to conclude that wearing buttons in the courtroom would always amount to reversible error and reasoning that the trial court should determine whether the display caused the defendant "tangible prejudice"); *Davis v. State*, 268 P.3d 86, 100 (Okla. Crim. App. 2011) (stating that a complaining defendant must establish actual prejudice to succeed on his complaint that spectators wore ribbons).

Justice Souter, in his concurring opinion, noted that "of the several courts that have considered the influence of spectators' buttons, the majority have left convictions standing." *Musladin*, 549 U.S. at 83 (Souter, J., concurring) (citing *State v. Speed*, 961 P.2d 13, 29-30 (Kan. 1998) (applying abuse of discretion standard, absent a showing of prejudice); *State v. Braxton*, 477 S.E.2d 172, 176-177 (N.C. 1996) (finding no error in the trial court's exercise of discretion in allowing spectators to wear buttons); *State v. Lord*, 114 P.3d 1241,

[6](...continued)
503-506 (1976), and *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986). *Musladin*, 549 U.S. at 72. "In *Williams*, the State compelled the defendant to stand trial in prison clothes, and in *Flynn*, the State seated the troopers immediately behind the defendant." *Id.* at 75.

1243-1245 (Wash. Ct. App. 2005); *Nguyen v. State*, 977 S.W.2d 450, 457 (Tex. App. 1998)). Although the Supreme Court has offered no guidance with respect to whether spectator conduct is subject to the "inherently prejudicial" test, it stated in *Musladin* that "part of the legal test of *Williams* and *Flynn* - asking whether the practices furthered an essential state interest - suggests that those cases apply only to state-sponsored practices." 549 U.S. at 76.

Notably, appellant alleges neither actual prejudice nor inherent prejudice. Rather, he posits that "[t]he only way to make certain that a jury verdict is based on the law and the evidence . . . is to make sure that spectators remain only spectators." Regardless of whether we employ a test of actual versus inherent prejudice, appellant cannot succeed on this claim. The trial court undertook preventive measures to ensure that the buttons in question respected the families' right to express their grief and represent the victims while protecting appellant's right to a fair trial. Although the description of the buttons included in the record is instrumental in our ruling, we nevertheless note that the record is silent as to how close the family members sat to the jury and how discernible the picture on the button was from that distance, factors that might have been relevant in our inquiry. We will not presume error from a silent record. On the record before us, there is no indication that the atmosphere of appellant's trial was coercive or intimidating. Accordingly, he is not entitled to relief.

## G. Sentencing

Stating only "that both the increase within the appropriate range and the imposition of consecutive sentencing is not warranted to the degree imposed in this case," appellant contests both the lengths of his sentences and the partial consecutive sentence alignment that resulted in an effective sentence of life imprisonment without the possibility of parole plus one hundred years.

### 1. Facts

At the sentencing hearing on appellant's non-capital offense convictions, five members of the victims' families testified about the impact the victims' deaths had on their lives. The State also submitted into evidence appellant's presentence report; evidence of appellant's 2003 conviction from Queens, New York; the court file from his Queens, New York case; evidence of a misdemeanor conviction appellant received in Kentucky; and appellant's juvenile record from Tennessee.

The State asked the court to consider eight different enhancement factors: (1) appellant's previous history of criminal convictions in addition to those necessary to establish the sentencing range, Tenn. Code Ann. § 40-35-114(1); (2) appellant's role as a leader in the commission of the offense, *id.* § 40-35-114(2); (3) appellant's treating the victims or

allowing the victims to be treated with exception cruelty, *id.* § 40-35-114(5); (4) for offenses that did not include an element of bodily injury, that the victims' personal injuries were particularly great, *id.* § 40-35-114(6); (5) that the offenses were committed to gratify appellant's desire for pleasure or excitement, *id.* § 40-35-114(7); (6) that appellant had failed to comply with the conditions of a sentence involving release into the community, *id.* § 40-35-114(8); (7) for offenses not including an element involving use of a firearm, appellant's possession or employment of a firearm in the commission of the offense, *id.* § 40-35-114(9); and (8) that appellant was on probation when he committed the instant offenses, *id.* § 40-35-114(13)(C).

Defense counsel argued that the following mitigating factors should apply to appellant's sentencing: (1) appellant played a minor role in the offenses, especially the offenses against the male victim, C.N., *id.* § 40-35-113(4); and (2) appellant acted under duress or the domination of another person, specifically his brother, co-defendant Davidson, *id.* § 40-35-113(12). In addition, under the "catch-all" provision of section 40-35-113(13), defense counsel asked the court to consider in mitigation appellant's dysfunctional family history; his lack of education; his learning disabilities; his history of emotional, mental, and psychological problems; his expression of remorse; and his compliance with police during his arrest.

In sentencing appellant, the trial court first addressed the factors that it did not find supported by the proof. The trial court found that there was no evidence to support appellant's position that he played a minor role in the offenses. However, the trial court also found that no proof supported the State's position that appellant was a leader in the commission of the offenses. In addition, the trial court found that appellant did not act under duress or the domination of another person. Thus, the trial court ruled that the mitigating factors enumerated in Tennessee Code Annotated sections 40-35-113(4) and -113(12) did not apply and that the enhancement factor from section 40-35-114(2) likewise did not apply.

Regarding the remaining mitigating factor, the "catch-all" provision, the trial court acknowledged that appellant had expressed remorse and complied with the police when he was arrested. In addition, the trial court noted appellant's family history and the impact it had on his development.

The trial court ruled that seven enhancement factors applied to appellant's sentencing. First, appellant had a history of criminal conduct beyond that necessary to establish his sentencing range, based upon his convictions in New York and Kentucky. *See* Tenn. Code Ann. § 40-35-114(1). The trial court accorded this factor "significant weight." Second, appellant treated or allowed the victims to be treated with exceptional cruelty, a factor that the trial court assigned "great, great weight." *See id.* § 40-35-114(5). Third, the trial court

ruled that the victims' injuries were particularly great and applied this factor to Counts 21, 23, 33, 34, 35, 42, 43, and 44. *See id.* § 40-35-114(6). The trial court did not assign great weight to this factor due to its similarity to the exceptional cruelty factor. Fourth, the trial court applied the factor that the offenses were committed to gratify appellant's desire for pleasure or excitement to Counts 34, 37, and 43. *See id.* § 40-35-114(7). Fifth, prior to trial, appellant had failed to comply with conditions of a sentence involving release into the community based upon his absconder status in New York and noncompliance with his Kentucky sentence. *See id.* § 40-35-114(8). Sixth, appellant possessed or employed a firearm in the commission of the offenses, a factor applied to Counts 5, 6, 10, 17, 22, 24, 36, 37, 38, 42, 43, and 44. *See id.* § 40-35-114(9). The trial court stated that it did not accord this factor much weight because of the paucity of proof regarding appellant's possession of a firearm and use of the firearm during the offenses. Finally, the trial court found that appellant was on probation when he committed the instant offenses. *See id.* § 40-35-114(13)(C).

The trial court stated that prior to its sentencing, it considered the trial testimony, the presentence report, the Sentencing Act, the victim impact statements, all pleadings submitted by counsel, arguments of counsel, and the nature of the offenses. The trial court determined that the maximum sentence within appellant's range was appropriate for each conviction. Therefore, because appellant was a Range I offender, the trial court imposed twenty-five-year sentences for all of appellant's Class A felony convictions and a twelve-year sentence for his one Class B felony conviction.

The trial court merged the alternate counts of each offense type and lesser-included offenses, resulting in the following convictions: Count 17, facilitation of first degree murder; Count 19, especially aggravated robbery of C.N.; Count 20, especially aggravated robbery of C.C.; Count 21, facilitation of especially aggravated kidnapping of C.N.; Count 23, especially aggravated kidnapping of C.C.; Count 42, aggravated rape of C.C. by anal penetration; Count 43, aggravated rape of C.C. by oral penetration; and Count 44, aggravated rape of C.C. by vaginal penetration.

The State argued that the trial court should impose consecutive sentences based upon appellant's being a professional criminal, having an extensive criminal record, being a dangerous offender, and having been on probation when he committed the offenses. *See* Tenn. Code Ann. § 40-35-115(b)(1), (2), (4), (6). Defense counsel contended that it was inappropriate to "stack" all of the convictions but conceded that appellant was on probation when he committed the offenses. The trial court disagreed with the State regarding appellant's being a professional criminal and having an extensive criminal record; however, the trial court found that appellant was a dangerous offender, *see id.* § 40-35-115(b)(4), and that he had been on probation when he committed the offenses, *see id.* § 40-35-115(b)(6).

The trial court ruled that Counts 19 and 20 would be served concurrently with each other for an effective sentence of twenty-five years; that Counts 21 and 23 would be served concurrently with each other for an effective sentence of twenty-five years; and that Counts 42, 43, and 44 would be served concurrently with each other for an effective sentence of twenty-five years. The trial court further ruled that these three effective sentences of twenty-five years each would be served consecutively to each other, to appellant's twenty-five-year sentence for facilitation of first degree murder, and to his life without the possibility of parole sentence, for a total effective sentence of life without the possibility of parole plus one hundred years.

For ease of reference, the following table illustrates the merger of appellant's convictions and his sentences:

| Count | Offense | Merged Counts | Sentence | Concurrent With | Consecutive To |
|-------|---------|---------------|----------|-----------------|----------------|
| 17 | Facilitation of First Degree Murder (C.N.) | 1, 2, 5, 6, 10, 13, 14 | 25 years | — | -19/20 -21/23 -42/43/44 |
| 18 | First Degree Murder (C.C.) | 3, 4, 7, 8, 12, 15, 16 | Life without Parole | | Several other sentences run consecutively to this sentence |
| 19 | Especially Aggravated Robbery (C.N.) | 45 | 25 years | 20 | -17 -21/23 -42/43/44 |
| 20 | Especially Aggravated Robbery (C.C.) | 46 | 25 years | 19 | -17 -21/23 -42/43/44 |
| 21 | Facilitation of Especially Aggravated Kidnapping (C.N.) | 22 | 12 years | 23 | -17 -19/20 -42/43/44 |
| 23 | Especially Aggravated Kidnapping (C.C.) | 24 | 25 years | 21 | -17 -19/20 -42/43/44 |

| 42 | Aggravated Rape (C.C.) | 33, 36 | 25 years | 43, 44 | -17<br>-19/20<br>-21/23 |
|----|------------------------|--------|----------|--------|--------------------------|
| 43 | Aggravated Rape (C.C.) | 34, 37 | 25 years | 42, 44 | -17<br>-19/20<br>-21/23 |
| 44 | Aggravated Rape (C.C.) | 35, 38 | 25 years | 42, 43 | -17<br>-19/20<br>-21/23 |

### 1. Maximum Length of Sentences

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. § 40-35-114, -210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id.* § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App.

Sept. 18, 1995) (citation omitted). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Bise*, 380 S.W.3d at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

We note that appellant's argument regarding the maximum sentences focuses on the trial court's "departure from the minimum penalties" for the convictions. This argument contravenes the 2005 amendments to the Sentencing Act in which the presumptive minimum sentences were abolished. In passing sentence in this case, the trial court considered all of the relevant statutory factors. Moreover, the trial court considered each of the enhancement and mitigating factors offered by the parties and assigned appropriate weight to each factor. Accordingly, the trial court imposed within-range sentences that are in compliance with the purposes and principles of the Sentencing act. *See Bise*, 380 S.W.3d 709-10. We therefore attribute the trial court's sentencing decision a presumption of reasonableness. *See id.* at 707.

Appellant contests the trial court's application of the enhancement factor that he possessed or employed a firearm during the course of the commission of these offenses by relying on "circumstantial evidence." We conclude that consideration of this factor was reasonable, due to the trial testimony about appellant's ownership of a firearm and the jury-out testimony concerning the recovery of appellant's weapon in Kentucky. Even if consideration of this factor was erroneous, it is insufficient to remove the presumption of reasonableness afforded to the trial court's sentencing determination. *See id.* at 709. Appellant has failed to establish that the trial court's determination was erroneous, and we discern no abuse of discretion. Appellant is not entitled to relief from the length of his sentences.

## 2. Partial Consecutive Alignment

Appellant also challenges the trial court's consecutive alignment of each of the four groups of criminal offenses. Prior to 2013, on appellate review of sentence alignment issues, courts employed the abuse of discretion standard of review. *See State v. Hastings*, 25 S.W.3d 178, 181-82 (Tenn. Crim. App. 1999). Our supreme court has since extended the standard of review enunciated in *State v. Bise*, abuse of discretion with a presumption of reasonableness, to consecutive sentencing determinations. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013); *Bise*, 380 S.W.3d at 707 (modifying standard of review of within-range sentences to abuse of discretion with a presumption of reasonableness); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying abuse of discretion with a presumption of reasonableness to review of alternative sentencing determinations by the trial court). Thus, the presumption of reasonableness gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b) . . . ." *Pollard*, 432 S.W.3d at 861.

The procedure used by the trial courts in deciding sentence alignment is governed by Tennessee Code Annotated section 40-35-115, which lists the factors that are relevant to a trial court's sentencing decision. Imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1). The length of the resulting consecutive sentence must be "no greater than that deserved for the offense committed." *Id.* § 40-35-103(2). The court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of the following seven statutory criteria exists:

(1)     The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;

(2)     The defendant is an offender whose record of criminal activity is extensive;

(3)     The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4)     The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;

(5)     The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6)     The defendant is sentenced for an offense committed while on probation; or

(7)     The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b). The *Pollard* court reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." *Pollard*, 432 S.W.3d at 862 (citing *State v. Dickson*, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* (citing Tenn. R. Crim. P. 32(c)(1); *Bise*, 380 S.W.3d at 705).

Of the seven statutory factors, the trial court in this case found the following to apply: "(4) the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high; . . . [and] (6) the defendant is sentenced for an offense committed while on probation." Tenn. Code Ann. § 40-35-115(b)(4), (6). Appellant offers no argument with regard to why either of those factors should not apply; he simply argues that "stacking" his sentences for the aggravated robberies and the kidnapping convictions was erroneous because the offenses were so closely related in the course of conduct. We reject this argument.

The record clearly reflects that appellant was on probation at the time these offenses were committed. Any one of these grounds listed in Tennessee Code Annotated section 40-35-115 is a sufficient basis for the imposition of consecutive sentences. *Pollard*, 432 S.W.3d at 862.

We must further note, however, that the trial court failed to engage in a discussion of the *Wilkerson* factors that must accompany application Tennessee Code Annotated section

40-35-115(b)(4). *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995). Pursuant to *Wilkerson*, before imposing consecutive sentences based upon the defendant's status as a dangerous offender, the trial court "must conclude that the evidence has established that the aggregate sentence is 'reasonably related to the severity of the offenses' and 'necessary in order to protect the public from further criminal acts.'" *Pollard*, 432 S.W.3d at 863. (quoting *Wilkerson*, 905 S.W.2d at 938). The *Pollard* court declined to eliminate this requirement in applying the abuse of discretion with a presumption of reasonableness standard of review to consecutive sentencing. *Id*.

However, the *Pollard* court offered guidance for how to address a situation wherein the trial court applied factor (4) without making the *Wilkerson* findings. Our supreme court stated:

> Where, as here, the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority. Faced with this situation, the appellate court has two options: (1) conduct a *de novo* review to determine whether there is an adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences. *See Bise*, 380 S.W.3d at 705 & n.41.

*Id*. at 863-64. Based on the record before us, we have no hesitance in determining, upon our *de novo* review, that partial consecutive sentencing was more than appropriate in this case. An aggregate sentence of life in prison without the possibility of parole plus one hundred years, if anything, falls short of being reasonably related to the severity of the offenses committed by this appellant. The level of torture endured by the two victims in this case, one of whom appellant had the opportunity to assist and perhaps save but declined to do so, justifies the necessity to protect the public from further criminal acts at the hands of this appellant. We conclude that the trial court's sentencing alignment was reasonable and did not amount to an abuse of discretion. Appellant is without relief on this claim of error.

## CONCLUSION

Based on our review of the entire record, the briefs of the parties, and the applicable case law, we affirm the judgments of the trial court.

_____

ROGER A. PAGE, JUDGE